# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 04-1467

**STATE OF LOUISIANA**

**VERSUS**

**DAVID LEE LEGER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 66512-F
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY HOWARD EZELL**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Glenn B. Gremillion, Billy Howard Ezell, and James T. Genovese, Judges.

**AFFIRMED.**

**Christopher Brent Coreil**
**District Attorney, Thirteenth Judicial District Court**
**P. O. Drawer 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Allen Bruce Rozas**
**Attorney At Law**
**200 Court St.**
**Ville Platte, LA 70586**
**(337) 363-5516**
**Counsel for Defendant/Appellant:**
**David Lee Leger**

**Kathy F. Meyers**
**Attorney at Law**
**514 W. Main Street**
**Ville Platte, LA 70586**
**(337) 363-3804**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**David Lee Leger**
**Washington Correctional Institute**
**27268 Hwy. 21**
**Angie, LA 70426**
**(318) 467-3355**

**EZELL, JUDGE**.

On October 14, 2003, the Defendant, David Lee Leger, was indicted by a grand jury with being a principal in the first degree murders of Brandy Vickers, Jennifer Leger, and Michelle Aucoin. He was also indicted on three counts of solicitation for murder and three counts of criminal conspiracy for his alleged involvement in the three murders. Prior to trial, the Defendant filed a writ application in this court seeking review of the trial court's denial of its motion to suppress. This court denied the writ application, finding no error in the trial court's ruling. *See State v. Leger*, an unpublished writ bearing docket number 04-237 (La.App. 3 Cir. 2/23/04). The State subsequently elected to reduce the Defendant's charges to second degree murder.

Presentation of the evidence in the case commenced March 1, 2004, and on March 8, 2004, the jury convicted the Defendant on the three counts of conspiracy to commit second degree murder and acquitted him of the remaining charges. On May 24, 2004, after denying the Defendant's motion for post verdict judgment of acquittal and motion for new trial, the trial judge sentenced the Defendant to twelve years at hard labor on each count to run consecutively. The Defense filed a motion for appeal which was granted June 4, 2004. The Defendant is before this court seeking review of his convictions and sentences.

## FACTS

The facts of this case are discussed in detail below.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, the court finds there are no errors patent.

## FIRST THREE ASSIGNMENTS OF ERROR AND SUMMARY OF THE ARGUMENT

In his first three Assignments of Error and Summary of the Argument, the Defendant challenges the sufficiency of the evidence presented by the State at trial. The Defendant first contends the jury went outside the record to find facts to support its compromise verdict. In support of his argument, the Defendant concentrates on the lack of evidence of threats or violence to any of the victims, child support problems, or a motive to kill victim Brandy Vickers. Next, the Defendant contends the jury did not eliminate all reasonable hypotheses of innocence. Finally, the Defendant argues the State failed to prove the Defendant possessed the requisite specific intent.

Louisiana Revised Statutes 14:26(A) defines criminal conspiracy as follows:

> Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

In *State v. Laws*, 95-593, pp. 2-3 (La.App. 3 Cir. 12/6/95), 666 So.2d 1118, 1121, *writ denied*, 96-89 (La. 9/13/96), 679 So.2d 102, this court stated:

> When an appellate court examines sufficiency of evidence, the standard of review is whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could conclude, beyond a reasonable doubt, that there was proof of each element of the crime. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When the conviction is based upon circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. La.R.S. 15:438. This is not a stricter standard of review, but it is an evidentiary guide for the jury when it considers circumstantial evidence. *State v. Porretto*, 468 So.2d 1142 (La.1985). If a case involves circumstantial evidence, and a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails; and unless another one creates reasonable doubt, the defendant is guilty. *State v. Captville*, 448 So.2d 676 (La.1984). Moreover, it is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore the appellate court should not second-guess the credibility

determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson*, 425 So.2d 1228 (La.1983).

In *State v. Johnson*, 01-1084, pp. 6-7 (La.App. 3 Cir. 2/6/02), 817 So.2d 120, 125, this court stated:

> An essential element of the crime of conspiracy is specific intent. *State v. Guillory*, 540 So.2d 1212 (La.App. 3 Cir.1989). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequence to follow. As a question of fact, intent may be inferred from the circumstances of the actions of the offender. See La.R.S. 14:10(1) and *State v. Valrie*, 99-226 (La.App. 3 Cir. 10/13/99); 749 So.2d 11, *writ denied*, 99-3236 (La.4/20/00); 760 So.2d 343.

Before addressing each of the Defendant's arguments regarding insufficiency of the State's case, we will first outline the testimony and evidence presented at trial. After outlining the testimony and evidence, we will then address several issues raised in the Defendant's Summary of the Argument, which precedes his arguments in Assignment of Errors Numbers One, Two, and Three.

## SUMMARY OF THE TESTIMONY

**The Defendant's and Kenneth Vickers, Jr.'s, Relationships to the Victims**

Prior to the Defendant's indictment, the Defendant's lifelong friend, Kenneth Vickers, Jr., pled guilty to manslaughter of each of the three victims, Brandy Vickers, Michelle Aucoin, and Jennifer Leger. The evidence presented at the Defendant's trial indicates that Kenneth Vickers, Jr., (hereinafter referred to as Kenneth) and his wife Brandy separated approximately a month prior to her murder and she remained in the marital home. While married, the family lived in a trailer behind Kenneth's father's home in Cypress Creek in Evangeline Parish. After Kenneth and Brandy separated, Brandy obtained a restraining order preventing Kenneth from going near her and their three children. Brandy and her friend, Michelle Aucoin, testified against Kenneth at the hearing to secure the order. Kenneth testified he did not see Jennifer Leger in the

3

courtroom on the day of the proceeding in the domestic case, but Sergeant Frank Gautreaux[1] testified he saw her "downstairs" with Michelle and Brandy. Kenneth testified he was depressed and suicidal and he talked to the Defendant about his troubles.

The other two victims, Michelle Aucoin and Jennifer Leger, had each been involved with the Defendant at different times. The Defendant first lived with Michelle Aucoin, and they had a son, Ryan, together. According to the Defendant's testimony, there were no issues concerning child support he paid to Michelle. This was corroborated to some degree by Janice Savoy, a support enforcement officer. According to Ms. Savoy, Michelle applied for assistance from the child support office. The Defendant had been ordered to pay $229.00 per month commencing August 15, 1992 for support of Ryan. The following August, Defendant was in arrears $415.00 and was placed on probation after being found in contempt of court. The Defendant was ordered to make monthly payments on the arrearage in September of 1993. In December of 2000, the file was closed because Michelle and the Defendant resumed living together. At the time of the file's closure, the Defendant was ahead in his payments by $84.80. There was no subsequent request to reopen the file.

According to Mary Griffith, Michelle's mother, Michelle and the Defendant last lived together approximately one and one-half years before Michelle's death. When they broke up, Ryan stayed with his mother. For the five or six weeks just prior to Michelle's death, she lived with Brandy Vickers. Mrs. Griffith testified she had no personal knowledge of any violent incidents between the Defendant and her daughter.

---

[1]Sergeant Frank Gautreaux is employed by the Evangeline Parish Sheriff's Office. He is the Defendant's uncle and lives near him.

After the Defendant's breakup with Michelle, he married Jennifer Leger and they had one child, Anna. The Defendant and Jennifer's marriage did not last, and upon their separation, the Defendant had visitation with Anna every other weekend. Jerry Samples, Jennifer's father, testified that he did not observe any physical violence between the Defendant and Jennifer during their marriage; however, their separation involved a "constant struggle between the two." Mr. Samples testified that Kenneth and Jennifer got along well.

Angela Briley, the intake officer for Evangeline Parish Support Enforcement, testified that as part of the judgment of divorce, the Defendant was ordered to pay $400.00 per month in child support for Anna and he was ordered to pay an additional $150.00 per month on his arrearage of $4,100.00. Records kept by Jennifer indicated that as of March 4, 2002, the Defendant owed $6,075.00 in back-due support. Ms. Briley testified that Jennifer executed an affidavit reflecting this, and she additionally signed a statement indicating she was willing to accept the $400.00 monthly payment as well as $150.00 per month for back-due support. Jennifer requested the State to assume collection of both monthly payments from the Defendant. A court date on the matter was scheduled for May 9, 2002, the day following Jennifer's death.

On March 21, 2002, Ms. Briley met with the Defendant. Although he agreed to the State taking over the collection of the $400.00 monthly payment, he did not agree with the amount of back-due support. He indicated to Ms. Briley that he and Jennifer had come to an agreement as to the back-due support; however, when Ms. Briley spoke to Jennifer on May 8, 2002, Jennifer indicated that she wanted to proceed as originally planned. She indicated at that time the total arrearage through the month of April was $6,875.00. At trial, the Defendant testified that he knew he was behind in his payments "a little bit," but he maintained he was not in arrears

5

$6,000.00. According to the Defendant, he agreed to pay Jennifer $100.00 per month on the arrearage, but he wanted a $50.00 break because he was also paying $250.00 a month for Ryan's support. The May 9, 2002 hearing was passed due to the death of Jennifer.

**The Sunday Before the Murders**

Kenneth testified that about a month or two prior to the murders, he was depressed, and in discussing his problems with the Defendant, he told him that he wanted to kill himself and that he did not feel like he had any reason to live. At first, the Defendant discouraged Kenneth from committing suicide and he comforted him, but on the Sunday prior to the murders, his response was different. According to Kenneth, he went to Fina Mart in Oakdale that afternoon to buy beer, and as he exited the store, he saw the Defendant. Kenneth walked up to the Defendant and told him that he wanted to use his gun to kill himself. According to Kenneth, the Defendant told him, "you ain't gonna use my gun unless you take them out. . . . you know, he said you got to take Brandy, Jennifer, and Michelle, out." Kenneth testified at a later point that the Defendant told him he could not use his gun "unless I took out Brandy, Jennifer and Michelle because they're the ones making me want to kill myself." Kenneth testified that he thought the Defendant was just "bull shitting around." Later in the conversation, the Defendant told him if he still wanted to kill himself, that he could come by the Defendant's house Wednesday night and that "he wasn't worried about the gun because [it was] in Carlton Cooley's name, and he would just tell the cops [Kenneth] stole it." Kenneth testified that Cooley was an old friend that the Defendant had worked with for five or six years.

6

**Kenneth's Actions the Day and Evening of the Murders**

Kenneth testified that prior to his incarceration, he had been living at his sister's (Brenda West) house in Oakdale, in Allen Parish for two to three weeks. On the Monday prior to the murders, he had arranged with Phillip Leger (Defendant's brother) to borrow his pressure sprayer to wash Brenda's house. On the morning of the murders, he called Phillip's wife Shelly, and asked whether he could pick up the sprayer. According to Kenneth when he arrived at Shelly's trailer, she came out on the porch and he spoke with her. He then retrieved the sprayer from on or near the rabbit cage. Shelly recalled the time of Kenneth's arrival as "[b]etween 11:00 and 12:00," at which time he appeared sober.

After leaving Shelly's house, Kenneth returned to his sister's house and started drinking the two or three quarts of beer he bought earlier that day. He testified that he was scheduled to be at a lawyer's office for 2:00 p.m. to pick up a settlement check. He arrived at the attorney's office, but left to speak to Harold Darbonne at the finance company where he had previously borrowed some money. Kenneth testified that he had promised Mr. Darbonne that he would repay his loan with the settlement money he received. Kenneth also intended to pay some bills to be paid prior to the remaining money being split between him and Brandy. Kenneth testified that after speaking with Mr. Darbonne, he left to retrieve the unpaid bills he had at his sister's house. Things did not work out as Kenneth planned. While Kenneth was at his sister's house retrieving the bills, Mr. Darbonne took out what he was owed on the loan, split the remaining money, and gave Brandy her portion. The bills were not paid. When Kenneth returned to the finance company, Brandy was leaving. According to Kenneth, she "had a wad of money and she kind of like shook it at me like that and then she called me a MFER and she said, now, I can take the kids to

7

Alabama. . . ." Kenneth testified that "[he] wanted to go kill [himself] even more cause I knew if I'd kill myself that be the ultimate way of hurting her heart." By the time Kenneth returned to the loan company to get his money, he had drunk the beer he had bought earlier, stopped by the store for a couple of more quarts, and drank half of one of them. Harold Darbonne corroborated Kenneth's testimony regarding his intention to pay bills out of the settlement proceeds. Mr. Darbonne testified that Kenneth also informed him that Brandy was on "dope" and that she and a couple of young women running around with her were looking forward to her receipt of the money so they could purchase more. Kenneth also said that he did not want Brandy to get any of the money because she was planning to leave with the children. As mentioned above, things did not work out as Kenneth planned and Mr. Darbonne witnessed Kenneth stomp out of the building, telling them they "did him wrong." Someone informed Mr. Darbonne that after Kenneth rounded the corner of the building, he fell to his knees crying. Winston Perron, Mr. Darbonne's business partner, described Kenneth at that point as a "broken down person."

Shelly Leger testified that around 4:00 p.m. that day, she saw Kenneth pull into Shelly Crawford's driveway, which was next door to her house, and "he went around, he made a U-turn into David's driveway, and came out." Shelly testified that to her knowledge, the Defendant was not at home that day. Shelly testified that when Kenneth pulled into the driveway, she was on the phone with Kenneth's sister, Sharon. Sharon asked Shelly whether Kenneth got out at the Defendant's house Shelly went on the back porch and looked, but did not see Kenneth's truck. By the time she returned to the front door ten seconds later, Kenneth was already on the road. Shelly testified that Kenneth was in the two driveways long enough to pull up and pull out. She did not see him stop.

8

Helen Gautreaux, the Defendant's aunt, testified that she saw Kenneth's truck at Defendant's house at about 3:00 p.m. The truck stayed at the Defendant's house for approximately two to three minutes. Mrs. Gautreaux testified that she thinks he "killed" the truck, but she was not positive.

After leaving the loan company, Kenneth headed to Pine Prairie to visit his sister Sharon. As Kenneth was passing Chad Gautreaux's (a friend's) store, he stopped when he saw Chad and another friend "Tank" standing outside. According to Chad, this was around 4:00 p.m.; Kenneth agreed.

Chad testified that when Kenneth arrived at the store, he was very upset, crying, "pissed off" and hysterical because he could not see his kids and the situation with his wife. According to Chad, Kenneth and Brandy always had problems. Chad testified that Kenneth asked if he could borrow his gun. After initially telling Kenneth he would loan him the gun, Chad later refused.

Chad testified that after he refused to loan the gun to Kenneth, he drove Kenneth and "Tank" around in his truck and they drank.[2] Chad testified that although he did drugs that day, Kenneth did not use drugs in his presence. On their ride, they stopped by Chicot.[3] During the ride, Kenneth drank quarts of beer and he cried off and on. He also told Chad that he wanted to kill "His wife, his wife's two girlfriends . . . her parents, her two brothers, the whole family . . . anybody that was in contact with her." Chad testified that Kenneth mentioned Brandy, her mother, and her girlfriends earlier during their ride. Later in the ride, he said he wanted to kill everybody that was around her or the house. According to Chad, Kenneth mentioned boyfriends, even though they weren't really Brandy's boyfriends. Chad testified that

_____

[2]Tank's given name is Jerry Dickens.

[3]Although no witnesses testified what "Chicot" is, we assume they were referring to Chicot State Park.

Kenneth mentioned Michelle by name, but did not mention Jennifer by name; however, he later acknowledged that her name could have been mentioned. According to Chad, he had heard Kenneth say he wanted to kill his wife many times before, but he never took him seriously. He had also heard Kenneth say on a previous occasion he wanted to kill "the girl she was hanging with and . . . the two guys that was hanging around his wife and Michelle and them." However, Chad later testified that Kenneth had not named people other than his wife on previous occasions.

After returning from Chicot, Chad and Kenneth dropped "Tank" off at the store, got some beer, and continued to ride around in Chad's vehicle. At one point, the two went to a fish fry behind a store in Turkey Creek. After the fish fry, they rode around and Chad tried to get Kenneth to calm down. Around 9:00 p.m., the two returned to Chad's store in Pine Prairie. According to Chad, at around 9:00 to 9:15 p.m., he and Kenneth split up, Kenneth "went a block or so" and about ten to fifteen minutes later, he met Chad at the carwash. Chad testified that Kenneth "went somewhere" in that time "but he didn't go far cuz he was just there." Kenneth then followed Chad to his house. Upon arriving at Chad's house, Kenneth was upset and "boiling again." He stayed at Chad's house for about fifteen to twenty minutes, during which time he again asked to borrow his gun. Chad refused. Chad testified that when Kenneth left his house, he could see the seats of his truck and he did not see a gun. When asked if he had seen a gun in Kenneth's truck at any time that day, Chad replied that they had looked through his truck for his wallet at around 5:30 or 6:00 p.m. and there was not a gun in there at that time. Chad testified that he was "almost 100%" positive that Kenneth did not have a gun when he left his house, which was some time between 9:20 and 9:35 p.m.

10

Chad later testified that Kenneth left "for at least 9:25 [p.m.]" and that it would take approximately twenty-five minutes to get to the Defendant's house from Chad's house. Rudy Guillory, an investigator with the District Attorney's Office, testified that he measured the distance from Chad's house to the Defendant's house and that it was 11.8 miles, which took him twenty-two minutes to drive.

According to Chad, at some point during that day, Kenneth told him that the Defendant was on his way home and that he was going to give him a gun. Chad testified that each time he refused to loan Kenneth his gun, Kenneth said "he was waiting on David. He said that'd be okay cuz David's usually home, he'd have one this afternoon." Chad acknowledged that he might not have mentioned this in his statement to Detective Joe Demoruelle; however, he also confirmed that Detective Demourelle did not ask him about the Defendant's involvement in the incident. When asked at trial what Kenneth planned on doing with the gun he was going to get from the Defendant, Chad responded, "[K]ill his...kill two girls...kill the girls. . . . [A]nd his family."

Kenneth testified that he recalled going to the Defendant's house after he left Chad's house and estimated it was between 9:30 and 10:00 p.m. because it was very dark. When he pulled up, the Defendant and his wife Shirley were sitting on the front steps. Kenneth testified that he did not see anyone else outside. As he started approaching the porch, Shirley went inside the house. Kenneth testified that he told the Defendant his "heart couldn't take it no more. I was ready to kill myself." According to Kenneth, the Defendant went inside for "a minute or two" and came back outside alone with his shotgun and a black strap with shells in it. Kenneth described the conversation between them as follows:

A.     Uh...he told me I had to take them out.

11

Q.    That's the first words he said to you?

A.    Yes, ma'am,..

Q.    Okay.

A.    ...and...uh...it's...he had told me I had to take them out and I think he had handed me the gun at that point or something.  That's when he had pulled my forehead down, well, to his and he told me that he loved me and I told him that I loved him, you know, I was crying already, and he started crying, and then...uh...let me see what else he said.

Q.    Did you say anything to him...

A.    Uh...

Q.    ...when he said you got to take them out?  Did you say who, or, what, or....?

A.    He had...he had made me swear on his life and...

Q.    Tell me....tell me what he said.

A.    Like after he handed...I don't remember if he handed the gun before he said that or...but he had told me....after he told me to take them out, he had told me, he said, you swear on my life, you know, like he...he was just...I remember him giving this deep, deep look, you know, like staring, I mean staring me down hard, and I swore on his life, then he told me to swear on my kids' life, so I swore on my kids' life.

Q.    What'd you say?

A.    Nothing, yes, I just said yes.

Q.    You didn't say I swear on my kids' life?  You just said yes?

A.    I'm...I think I said I...I think I just said yes.

Q.    Okay.  What else did ya'll say between the two of ya'll?

A.    Uh...I want to say we talked about something else but it's...it's not clear and...uh...I think about like...just before I left or something I...I remember saying I can't do it or I couldn't do it, but I'm not clear exactly when I said that or where and...uh....like going back to my truck it's just like blank again.  I don't even remember leaving his house.

      . . . .

12

Q. What did you do at that. . . .so at that point you have the gun and the strap?

A. Yes, ma'am.

Q. Um...

A. I'm pretty sure I did, you know, the last I remember it was him handing it to me.

Q. When he said you got to take them out did you know what he was talking about?

A. Yes, ma'am, from the conversation we had had that Sunday.

. . . .

Q. What did you interpret that to mean?

A. I...to kill them.

Q. Kill who?

A. Brandy, Jennifer, and Michelle.

Shelly Leger testified that she talked to Jennifer and Brandy on a daily basis and that she spoke to Michelle "off and on." Shelly testified that she talked to Jennifer at about 9:15 or 9:20 p.m. on the night of the murders for "maybe ten minutes." Shelly testified that Brandy called her collect and she immediately returned Brandy's call. This was "roughly 9:30, 9:35 p.m." Shelly testified that while she was on the phone with Brandy, Shelly told her she thought she heard Kenneth's truck, which she recognized by its distinctive sound, and that it sounded "like it had just left from somewhere, like it had been stopped, and when [she] looked out there was no lights, [she] could hear the truck going down the road, but there was no lights." According to Shelly, she heard the truck between 9:30 and 9:40 p.m. and she continued her phone conversation with Brandy.

Kenneth testified that the next thing he recalled after leaving the Defendant's house was "seeing bits and pieces of my driveway and my daddy's shed." Shelly

13

testified that she was on the phone with Brandy when Kenneth entered the house and she heard Brandy say, "call" and she heard Kenneth say, "you think you can get away with...." Kenneth testified that he recalled seeing his wife "laying there dead" and hearing his children crying. Kenneth testified that he did not recall shooting Brandy, but he remembered his attempts at resuscitation were unsuccessful. Kenneth testified he put his little boy in the truck and he stopped and told his dad that he did it and he told his little girls that he loved them. Kenneth testified that he remembers that his little boy asked him where he was going and Kenneth told him he was going to bring him to his "Aunt BeeBee's" and that he was going "go down the road and shoot [him]self." According to Kenneth, the boy's "eyes filled up with tears and he said, Daddy, please don't kill yourself, I love you, and then right there is when I knew I couldn't kill myself." Kenneth testified that he did not recall going to Jennifer Leger's house that night.

Kenneth testified that he thinks he went to his sister's (Brenda West's) house after he left Brandy's. His testimony indicates he did not have a clear recollection of his conversations while he was there. Ms. West testified that just before 10:00 p.m., Kenneth showed up at her house with his little boy. He told her that he killed Brandy, Jennifer, and Michelle. When she asked why, he said "I had to." James Sparrow, who had lived with Ms. West for approximately fifteen years, testified that Kenneth told him that night that "[he] took care of one...uh...Dav...David's problems." Mr. Sparrow testified that he saw the gun on the seat of Kenneth's truck. Mr. Sparrow testified on direct examination that Kenneth told him he got the gun from David Leger. On cross-examination, Mr. Sparrow testified that Kenneth first said he took the gun from the Defendant and later said he stole it. He did not say the gun was given to him, nor did he imply that there was a personal meeting between he and the

14

Defendant.  In Mr. Sparrow's statement to Joe Demourelle given three days after the murders, he said Kenneth told him he took the gun from the Defendant's house.  He said he broke into the house and got it.

**The Defendant's Actions Following the Murders**

The Defendant's actions following the murders indicate he possessed information that he could not have known were he not a co-conspirator.  According to Mr. Vickers, seconds after Kenneth left his house and his truck could still be heard going down the road, the Defendant drove up in Mr. Vickers' driveway and got out of his truck.[4]  Mr. Vickers testified that his conversation with the Defendant was as follows:

> A. The first thing he said when he got he said, Big Kenneth, what in the hell is wrong with Little Kenneth or your son.  I forget just which it was but it was one of the two.
>
> . . . .
>
> A. I said I don't know, David.  I don't know more...know more than what the girls just told me.
>
> Q. And did he ask you what the girls had told you?
>
> A. Then I told him and he's...y'all excuse me language, he said, oh, goddamn, I gotta get out of here.  That's his very words.
>
> Q. Okay, um...what did you tell David that the children had said to you?
>
> A. That his daddy had shot and killed his mama and Aunt Michelle.

Mr. Robert Cecil Vickers, Kenneth Vickers Sr.'s brother, testified that he and his wife Paula live on the property adjacent to Mr. Vickers' trailer.  They were standing at the fence approximately twenty feet from Mr. Vickers' porch when the

---

[4]Shelly Leger testified she informed the Defendant that Kenneth Vickers had killed Brandy and Michelle and that he needed to go check on Ryan.  The Defendant told Shelly he was leaving to get Ryan; Shelly testified the Defendant left his house shortly after she hung up.

Defendant drove up. Robert Vickers corroborated Mr. Vickers' testimony regarding the statements made by the Defendant, but Robert testified he also heard the Defendant say, "it's getting deep" before he said he had to go. According to these two witnesses, the Defendant was driving fast as he arrived and left. Mr. Vickers testified that the Defendant was acting "kind of scared." Robert Vickers was asked what tone of voice the Defendant used in speaking to Mr. Vickers. He responded that the Defendant was "scared to death" and "trembling" and speaking in a loud voice.

Additionally, the Defendant testified that he learned from Shelly Leger that his gun was used in the commission of the murders. He testified that when he learned his gun was missing, he had his sister contact Helen Gautreaux[5] to report it stolen. Mrs. Gautreaux made the call to report the gun missing at approximately 10:05 p.m. Shelly Leger testified that she found out from Brenda West that the Defendant's gun was the murder weapon. Shelly did not talk to Brenda until 10:15 to 10:30 p.m. that night.[6] Shelly testified that the Defendant called her after she hung up with Brenda and she asked him why he sold Kenneth a gun. The Defendant denied selling Kenneth a gun and checked to see if his gun was missing. He returned to the phone approximately ten to fifteen seconds later and said his gun was gone. Shelly testified that she told the Defendant he needed to report it. According to Shelly, this conversation with the Defendant took place between 10:30 and 10:45 p.m.

---

[5]Helen Gautreaux is married to Frank Gautreaux, a sergeant with the Evangeline Parish Sheriff's Office. They live in Cypress Creek community, a remote area. Sergeant Gautreaux testified that people in the community call him for "law-related" problems "ninety percent of the time."

[6]On direct examination, Shelly testified that she talked to Brenda at "10:20, 10:30 [p.m.]." On cross-examination, she said it was "between approximately 10:15, 10:30." Shelly ended her call with Brenda when the police arrived at Brenda's house, which was at 10:29 p.m.

16

Ms. West testified that she first found out from the Defendant that her brother used the Defendant's gun. He was the first person to call her house that night after Kenneth arrived.[7] Ms. West testified that the Defendant called her and asked why Kenneth had killed "those women" with his gun. Ms. West testified she received the Defendant's call before she called 911, which was at 10:05 p.m.

The chief of police in Pine Prairie, L.C. Deshotel, testified that on the night of the murders, just before 10:30 p.m. on his clock, which is set twenty to thirty minutes ahead, he got a call from someone who addressed him by his nickname "Puna." The caller did not identify himself, and Chief Deshotel testified that he was not positive of the caller's identity, but he believed it was the Defendant, whom he had known for a long time. Chief Deshotel testified that he is familiar with the Defendant's voice in person and that the Defendant always calls him "Puna." The caller told Chief Deshotel that "Kenneth had killed the three girls and he was going to Oakdale to his sister's house with his son." Chief Deshotel testified that he called the Evangeline Parish Sheriff's Office approximately a minute later to report the information and he was told only two murders had been reported. Evangeline Parish Sheriff's Department deputies investigating the murders first learned of the third victim at approximately 11:45 p.m. when they went to Brenda West's home.

Anthony Paul Fontenot, a longtime friend of both Kenneth and the Defendant, testified that about a week after the murders, he visited with the Defendant and he asked the Defendant if he had really given Kenneth the gun. The Defendant told him that he gave Kenneth the gun on the night of the murders. Mr. Fontenot testified, "I asked him why he give it to him and he done say he just ask me if it...you know, he

---

[7]Brenda initially testified that she told Shelly what the Defendant had told her about his gun being used; however, she later testified that she did not tell Shelly anything about how the gun may have gotten into Kenneth's possession.

17

had a gun he could use." According to Mr. Fontenot, in a conversation he had with the Defendant about six or eight months later, the Defendant told him he gave Kenneth the ammunition belt when he asked for shells. Mr. Fontenot testified that the Defendant told him Kenneth came looking for a gun, but the Defendant did not know what he wanted to do with it.

**DEFENSE'S "SUMMARY OF THE ARGUMENT"**

In its brief to this court, the Defense presents a Summary of the Argument in which it attacks the jury's finding of guilt. In their summary, they discuss the testimony that they feel would prevent or prohibit a reasonable jury from finding the Defendant guilty beyond a reasonable doubt. The court will briefly discuss these issues prior to addressing the Assignments of Error.

**Alibi Witnesses**

First, the Defense points out that on the evening of the murders, from the time of the Defendant's return from work until he heard of the murders of Brandy and Michelle, there were people at his home (namely, Patricia Harrelson, Joe Harrelson, Albert Stanley, and Torey Harrelson) who testified that Kenneth did not appear at the Defendant's house at any time that night. Joe Harrelson, the Defendant's brother-in-law, testified at trial that he was at the Defendant's house when the Defendant returned from work at about 8:00 or 8:15 p.m. He stayed for fifteen to thirty minutes after the Defendant's arrival and he returned home to Oakdale at about "8:30...20 to 9:00 p.m." According to Mr. Harrelson, the drive home takes anywhere from ten to fifteen minutes. He testified that he returned to the Defendant's residence later that evening with his uncle, aunt and brother between 9:00 and 9:15 p.m. and left at about 11:15 or 11:20 p.m.; however, in his statement to a detective given eight days after the murders, Mr. Harrelson said he returned to the Defendant's house "between 9:30

18

till 10 to 10:00... 5 to 10:00 p.m., somewhere around there... around 10:00 o'clock." At trial, it was shown that Mr. Harrelson had testified at a bond hearing that they left Oakdale to go back to the Defendant's house between 8:45 and 9:15 p.m. and they arrived about "9:15...9:30 p.m."

Albert Stanley, who was with Joe Harrelson that night, testified that they left Oakdale to go to the Defendant's house after 9:00 p.m. because one of his nephews wanted to see the end of a show he was watching. Mr. Stanley estimated the time of arrival at the Defendant's house at "9:20 ..9:25... 9:30 p.m. somewhere . . . give or take." These two witnesses testified that they did not see Kenneth at the Defendant's house while they were there. Additionally, Torey Harrelson, the Defendant's stepdaughter, testified that from the time she got home from school until she went to bed she did not see Kenneth Vickers at her house.[8]

The court notes Helen Gautreaux testified that she saw two to three additional cars at the Defendant's house a little before 9:00 p.m. On cross-examination, she testified it was around 8:45 p.m.

In *State v. Duncan*, 93-1384, p. 8 (La.App. 3 Cir. 4/6/94), 635 So.2d 653, 657, *writ denied*, 94-1067 (La. 10/28/94), 644 So.2d 649, this court stated:

> Where conflicting testimony exists, calling for a determination of credibility of the witness is a matter of weight of the evidence and not its sufficiency. *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *State v. Nolan*, 503 So.2d 1186 (La.App. 3 Cir.), *writ denied*, 507 So.2d 226 (La.1987).

The jury could have chosen to believe the part of Joe Harrelson's testimony concerning the time given in his statement, which was that they arrived back at the

---

[8]Although Patricia Harrelson's testimony is mentioned by the Defense, she did not testify regarding the time of the group's departure from Oakdale or their arrival at the Defendant's house. From Mrs. Harrelson's testimony, it is clear she did not accompany her relatives to the Defendant's house that night.

Defendant's house anywhere from 9:30 to around 10:00 p.m. and rejected the remaining testimony. Alternatively, the jury could have rejected each of these witnesses' testimonies entirely. We find this claim has no merit.

**Kenneth Vickers' Credibility**

Next, the Defense challenges Kenneth's credibility, focusing on the different version of events provided by Kenneth in his May 14, 2002 statement and his trial testimony, as well as his inability to recall the commission of the murders.

At trial, Kenneth testified that he gave a statement to Detective Joe [Demourelle] on May 14, 2002, and prior to that time, he could only recall bits and pieces of what happened. After praying "a lot," Kenneth began repeatedly having the same dream and he believed the Lord was trying to show him something. Kenneth testified that he relayed his dream to Detective Demourelle in his May 14 statement; however, he acknowledged that he may not have made it clear to Detective Demourelle that the statement was based on a dream. In that statement, Kenneth said the Defendant shot Brandy and Michelle and he also implicated the Defendant in the murder of Jennifer. On March 7, 2003, the day he entered a guilty plea to reduced charges of manslaughter, Kenneth gave a second statement, again implicating the Defendant, by stating the Defendant loaned him the gun with the mandate that he kill the three women. The following colloquy during trial reveals the reason for the Defendant's order to kill the women:

Q. And why should you do that he...he said?

A. ...because they were the ones wanting....

. . . .

A. Because they were the ones making me want to kill myself.

Q. Ah, that's what he said. Because they were the ones....

20

A. Un...huh.

Q. ...wanting to make you kill yourself?

A. Yes, sir.

Kenneth testified that no promises were made to him and that the plea was not conditioned upon anything. He testified that the statement was given freely.[9] Kenneth's attorney at the time of the plea, Kyla Romanach, confirmed that there were no conditions to the plea, and she testified that the State reduced the charges to avoid going to trial. She explained that the statement was given the same day as the plea because everyone was there and her client would not be returning to Ville Platte due to his incarceration.

The Defendant's final claim in his Summary of the Argument is that in all of Kenneth's statements after his confession to Brenda West and James Sparrow he claimed "such vague recollection to the point of repeating some 50 times that he didn't remember or didn't know, and, in fact, didn't even know if he had killed them." The Defense contends Kenneth's testimony is impossible to believe because he has very little recollection of the events before and after he met the Defendant on the night of the murders. Additionally, the Defendant points out Kenneth's two statements are irreconcilable.

It is true that Kenneth had only a vague recollection of what took place the night of May 8, 2002, before and after his meeting with the Defendant. At trial, Kenneth recalled meeting and riding around with Chad and "Tank" and asking to borrow Chad's gun. He recalled that they were in Chad's truck and Chad was driving. Kenneth remembered being at Chicot, although he does not remember arriving there or leaving. He also recalled being at a fish fry in Turkey Creek and that

---

[9]There was some discrepancy at trial as to whether the statement was given before or after Kenneth entered his guilty plea.

21

they had dropped "Tank" off prior to that point. When asked if he could recall any of the people at the fish fry, Kenneth mentioned Mike Deville and Cody Burleigh.[10]

Kenneth testified that he did not recall what he discussed with Chad while they were together, but he remembered that they looked through his truck for his wallet at some point. Kenneth also recalled going to Oakdale where he thinks Chad purchased some crack or some kind of dope. When asked whether he used any of the crack-cocaine, Kenneth replied, "I want to say I might of tried it toward the end but I'd be lying to you if I did cause I don't really recall." Chad denied taking Kenneth to Oakdale to purchase drugs and he testified that Kenneth used no drugs in his presence. However, Chad admitted that he used a "little coke" that he already had. Kenneth testified that he recalled Chad dropping him off that night, but, although he was unsure, he thought he had talked to Chad at his house. Kenneth's recollection of the events that occurred after he left the Defendant's house were discussed above.

In *State v. Bourque*, 94-291, p. 6 (La.App. 3 Cir. 11/2/94), 649 So.2d 670, 673, this court found the State did not present sufficient evidence to prove the defendant's guilt beyond a reasonable doubt, holding:

> Eyewitness testimony alone can be sufficient in some cases to establish guilt beyond a reasonable doubt. See *State v. Dumaine*, 534 So.2d 32 (La.App. 4th Cir.1988), writ granted on other grounds, 541 So.2d 880 (La.1989). However in this case, the only evidence which identifies this defendant as the one who committed the offense comes from an eleven year old child who acknowledged on redirect examination by the state that at best, he saw a white person fire the weapon who could have been the defendant, and the testimony of a bystander who admitted to having consumed an exorbitant amount of alcohol before the incident. That testimony standing alone contributes substantially toward a reasonable doubt in any rational fact finder's mind. When that evidence is combined with the contradictory testimony of the other witnesses and viewed in the light most favorable to the prosecution, we are constrained to hold that the essential elements of the crime were not proven beyond a reasonable doubt.

---

[10]Chad testified that Mike Deville was at the fish fry; however, he did not mention Cody Burleigh's name.

22

We find the conversation between the Defendant and Kenneth on the Sunday prior to the murders, the Defendant's actions shortly after the murders, and his statements to Anthony Fontenot are sufficient to prove the elements of the crime.

Kenneth testified that the Defendant told him on the Sunday before the murders that he could not use his gun unless he "took out" Brandy, Jennifer, and Michelle and that if he still wanted to kill himself he could come by the Defendant's house Wednesday night. According to Kenneth, the Defendant also expressed a lack of concern due to the fact the gun was registered in someone else's name and he said he would tell police that Kenneth stole it from him.

Although Kenneth testified that he was at the Fina Mart buying beer, there was no testimony presented to show he was intoxicated at the time of his conversation with the Defendant. Thus, even if this court disregards Kenneth's testimony regarding his encounter with the Defendant on the night of the murders, still remaining are the Sunday conversation, the fact the Defendant showed up at one of the murder scenes shortly after Kenneth's departure and made statements indicating he knew what occurred and that he needed to get out of there, the call made to L.C. Deshotel by someone he believed to be the Defendant informing him of the murders of three women when only two had been reported, and the fact the Defendant told a friend he gave Kenneth the gun and ammunition on the night of the killings. We find this is sufficient to prove conspiracy beyond a reasonable doubt.

The jury was free to accept or reject any portion of Kenneth's testimony and this court should not second-guess the jury's credibility determination. Accordingly, we find this claim has no merit.

23

The Defendant contends the jury went outside the record to find a "factual basis for their compromised verdict."

**A. No evidence whatsoever of threats or violence to any of the victims.**

The parents of victims Michelle Aucoin and Jennifer Leger testified that they had never seen any threats or evidence of physical violence toward their daughters by the Defendant. The Defendant contends that he is not and was never a violent person and that he is innocent of the crimes of which he was convicted.

First, we note that although specific intent is an element of criminal conspiracy, motive is not. *See* La.R.S. 14:26, *State v. Johnson*, 01-1084 (La.App. 3 Cir. 2/6/02), 817 So.2d 120 (specific intent required). However, the Louisiana Supreme Court has stated "a lack of motive may properly be considered as a circumstance mitigating against specific intent." *State v. Williams*, 93-2707, p. 4 (La. 3/11/94), 633 So.2d 147, 149 (*quoting State v. Mart*, 352 So.2d 678, 681 (La.1977)).

We note that although the Defendant may be correct in his assertion regarding the lack of evidence of threats or violence from some witnesses' testimonies, there was also testimony presented at trial to indicate Jennifer Leger may have been afraid of the Defendant. There was testimony that after Jennifer and the Defendant separated, the Defendant had a key to the house so that he could assist in the administration of IV medication to their daughter. At times, Jennifer would come home to find someone had been in her house, but there was no sign of a break-in. For this reason, Jennifer kept a gun by her bed. Not long before her death, she changed the locks on her house.

There was also testimony presented at trial that the Defendant told Kenneth that he wanted to marry Shirley, but did not know how he was going to support Shirley

and her four children. In this conversation, the Defendant mentioned that "the bitch" (Jennifer) was taking him back to court and "them two bitches was always causing him trouble." Kenneth testified that he knew the Defendant meant "money troubles." According to Kenneth, the Defendant had a key to Jennifer's house and he went over one night to kill her, but didn't because his little girl was there. Kenneth testified that he was so used to hearing this kind of thing that he "let it go through one ear and out the other."

Kenneth testified that the Defendant had hated Brandy, Jennifer, Michelle and Shelly Leger for a long time and often said he wanted to kill them; he blamed them for his trouble with other women, saying "they always up in his business." According to Kenneth, the Defendant blamed Shelly and Brandy for his break-up with Michelle and he blamed Jennifer and Michelle for his lack of money. Kenneth testified that about a month or two prior to the murders, the Defendant attempted to get custody of Ryan to avoid paying child support to Michelle, but when his plan backfired, he said, "I'd like to kill that bitch."

## B. No relevant evidence of child support problems.

The Defendant points out that he was actually ahead in his child support payments to Michelle and in Jennifer's case, she disagreed only with the amount to be paid on back due support. He contends that both child support officers made it clear that they saw no evidence of controversy. The Defendant notes that the State presented no evidence of threats to the two women over child support payments. Finally, the Defendant states that any argument that the death of the mothers of these two children would change the child support obligation "insults the intelligence" because the children are still alive.

25

The State notes that the Defendant admitted at trial that a genuine issue existed as to the amount of arrearage he owed Jennifer and the amount of the monthly payment that he would make to satisfy the arrearage. Additionally, Shelly Leger testified that the Defendant and Jennifer had an argument concerning child support in her presence in March of 2002. Finally, as discussed in the previous section of this opinion, Kenneth testified that the Defendant expressed concern about his inability to support Shirley and her children due to the amount of child support he was paying Michelle and Jennifer. Contrary to the Defendant's assertions, there was evidence presented of child support problems.[11]

As mentioned above, the Defendant contends "any argument by the State that the death of these women would in any way change any child support situation insults the intelligence – the children are still alive!" It should be noted that the Defendant testified at trial that on the morning following the murders, he went to court [for his scheduled support hearing for Anna] and his father called him into the judge's chambers. According to the Defendant, he was given "some papers for having partial custody of my kids or temporary custody of the kids." The Defendant testified that Anna and Ryan stayed with him until his incarceration.[12] As mentioned previously, Kenneth testified that the Defendant told him that about a month or two prior to the

---

[11]Although the Defendant does not mention this in his argument, this court notes at trial the Defendant testified that his wife Shirley receives approximately $700.00 per month in child support for her four children.

[12]Jerry Samples, Jennifer's father, testified that Anna stayed with them for the week following the death of her mother. Mr. Gautreaux then removed Anna from the Samples' home and placed her with her father, who had a "temporary emergency custody." After a subsequent court proceeding, the Samples were named the domiciliary custodians of Anna with limited supervised visitation to the Defendant. Ryan's grandmother, Mary Griffith, testified that she had custody of Ryan at the time of trial.

murders he was going to attempt to obtain custody of Ryan so that he did not have to worry about paying child support to Michelle.

If the jury relied on the child support issue as proof of the Defendant's intent, we find they were not unreasonable in doing so. Obviously, from the Defendant's statement to Kenneth, he believed that he would no longer be required to pay child support to Michelle for Ryan if he was awarded custody of him. Though the Defendant's custody of the children would still require his support of them, his comment indicates he believed having a child [or children] in his custody would be economically beneficial.

**\_\_\_\_\_C. No evidence whatsoever of any motive, reason or connection to the death of Brandy.**

In this section of the Defense's brief, it challenges the State to point to any evidence that would provide a reason the Defendant desired Brandy's death. Thus, the Defendant contends the jury had to fabricate evidence from outside the record to find a motive. As discussed previously, Kenneth testified that the Defendant hated Brandy and the other women for meddling in his personal life and he blamed Brandy for his break-up with Michelle.

Contrary to the Defendant's assertions in his brief, as established in the foregoing discussion, the jury did not have to go outside the record to find facts. This court will not second-guess the credibility determination made by the jury. Thus, none of these issues warrant relief.

### ASSIGNMENT OF ERROR NUMBER TWO

The Defense sets forth various hypotheses of innocence that the jury failed to consider. Had it done so, the Defense contends an acquittal would have been mandated. As discussed above, when a conviction rests on circumstantial evidence, every reasonable hypothesis of innocence must be excluded. "However, La.R.S.

27

15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt standard; it is merely an evidentiary guide for the jury when considering circumstantial evidence." *State v. Manning*, 03-1982, p.46 (La. 10/19/04), 885 So.2d 1044, 1088 (*citing State v. Porretto*, 468 So.2d 1142, 1146, (La.1985)). We will discuss each hypothesis of innocence as outlined by the Defendant.

**A. Reasonable Hypotheses: Vickers alone conceived, planned, and executed the murders.**

The Defense points to various facts established at trial which tend to show Kenneth acted alone in murdering the three women, specifically:

> 1) At the time he killed the three women he was under a protecti[ve] order issued by the Court specifically because his wife had been threatened with murder. At least one of the women, Michelle Aucoin, testified against him. Jennifer Leger, it is believed, provided them transportation to court.[13]
>
> 2) Starting that very afternoon, Vickers repeatedly announced specific threats against *all* three women and did so right up to within minutes of the murders.
>
> 3) The threats were so obvious that the loan officers testified that they feared something was going to happen to the three women.[14]

---

[13] Shelly Leger testified that Brandy told her that Kenneth was threatening her; however, we did not locate any testimony regarding the nature of his threats and the Defendant does not provide a record page reference. Also, it was not definitively established at trial that Jennifer provided Brandy and Michelle transportation to court the day she secured the protective order; however, it was suggested.

[14] Harold Darbonne, one of the two owners of the loan company, testified that Kenneth was mad when he left, but he did not testify that he feared something was going to happen. Winston Perron, the other owner, testified that after observing Kenneth crying, he told his secretaries that Kenneth was a "broken man" and that something bad was going to happen. Mr. Perron felt Kenneth would either commit suicide or kill his ex-wife; however, he did not testify that he believed harm would come to the "three women," as Defendant's asserts.

28

4)     His brother-in-law Sparrow and his sister knew that he had "lost it" that afternoon and they feared what he was going to do.[15]

5)     His sister Brenda West testified that his plan had failed, that is, to keep all the money from the settlement so that his wife would not go to Alabama with the children.

6)     Shortly after the murders and before he could make up any story, Vickers told his father that he had "done what I had to do" and later defined that statement when he told both his sister and brother-in-law that he had killed all three women, Brand[y], Michelle, and Jennifer, and had done so with a gun he had stolen from David's trailer that afternoon.

7)     Kenneth Vickers, Jr., pled guilty to the killing of all three women, without any qualification or statement whatsoever[.]

With the exception that some of this information is slightly overstated by the Defense, the court notes that this testimony was presented to the jury. Since the jury convicted the Defendant of three counts of conspiracy, it apparently believed that the Defendant loaned Kenneth his gun with instructions that he kill the three victims. A rational trier of fact could have concluded that Vickers acting alone was not a reasonable hypothesis of innocence. Thus, this claim has no merit.

**B. Reasonable Hypotheses: The fact that David Leger knew nothing about Jennifer's death.**

**Rebuttal Brief: Two murders vs. three murders - the hypothesis that cannot be eliminated.**

Defense counsel points out that the Defendant never expressed any sign of knowledge that Jennifer had been killed. First, he notes that once the Defendant was informed of the deaths of Michelle and Brandy, he went to check on Ryan, yet he never showed any concern for Anna. Had he been involved in a conspiracy to kill these three women, Defense counsel argues that the only reasonable conclusion

---

[15]Brenda West testified that she was informed by "Skeeter" (James Sparrow) and Winston Perron that her brother was extremely upset. Likewise, Skeeter testified that Kenneth was upset because things did not work out as he planned; however, we did not locate any testimony by either Brenda West or James Sparrow that they feared what Kenneth was going to do. We note the Defense provided no record page references for this information.

would be that upon learning of the deaths of Brandy and Michelle, the Defendant would have been concerned for the child he knew was with Jennifer. The Defense notes that even after the Defendant learned that the police had gone to the area where Jennifer lived, he did not indicate he knew of Jennifer's death nor express concern for Anna's safety. His concern for Anna, he contends, was evidenced by the fact he administered medical treatments to her when Jennifer was working and the fact he obtained custody of her the day following the murder.

Whether the Defendant was genuinely concerned for Ryan is debatable. The Defendant testified at trial that he went to check on Ryan after learning of the murders of Brandy and Michelle, and was told by Mr. Vickers that Ryan was at his grandmother's house. Mr. Vickers, in testifying as to what the Defendant said that night, did not mention that the Defendant asked about Ryan; however, this specific question was not asked of him. Robert Cecil Vickers testified that he did not hear the Defendant ask about Ryan while the Defendant was at Mr. Vickers' house, nor did he hear Mr. Vickers say anything about a child being somewhere else; however, he testified that it would not have meant anything to him because he did not know the Defendant's children.

We note the Defendant testified at trial that he returned home upon learning that Ryan was at his grandmother's house. He did not call to check on Ryan or verify his whereabouts because he felt he was all right if he was at his grandmother's house. The Defendant was asked whether he felt a good father would want to be with his child to comfort him if the child was finding out his mother had been killed and he replied, "Yes ma'am I guess."

We find the fact that the Defendant did not express concern for Anna's safety does not support a reasonable hypothesis of innocence. Had the Defendant expressed

concern for Anna upon learning of the deaths of Michelle and Brandy, suspicion would have been aroused as to the source of his knowledge. To conceal his involvement in the murders, he could not have expressed concern for Anna until he learned of Jennifer's death from an independent source, which he did the morning following the murders. Again, this argument is based on evidence presented by the Defense at trial, which was apparently rejected by the jury. We find this claim has no merit.

The Defendant claims that because Shelly Leger did not find out about the third victim, Jennifer Leger, until midnight, the Defendant could not have known about it. The Defendant claims that if he was part of the conspiracy, he would have suspected his wife's murder, but there was no proof of that presented at trial. The court notes L.C. Deshotel's testimony tends to show the Defendant was aware of Jennifer's murder the night of May 8, 2002.

Again, for the Defendant to conceal his involvement, he could not show any signs that he suspected his wife had been murdered until he found out from an independent source. This evidence was presented by the Defense at trial and was apparently rejected by the jury. We find this claim has no merit.

**C. Reasonable Hypotheses: The Murders resulted from a drunken spree that started in the morning and erupted at 1 p.m. and not any "plan" or conspiracy.**

**D. Reasonable Hypotheses: There was no creditable evidence of any prior meeting between Vickers and Leger where harm to the victims had even been discussed.**

The Defendant contends that the jury did not eliminate the reasonable hypothesis that the Defendant, at work on the day of the murders, had no knowledge of Vickers' drunken "spree" or his encounter with his wife over settlement funds. Additionally, relying on Kenneth's May 14, 2002 statement in which he stated that

on the Sunday before the murders he asked to borrow the Defendant's gun to shoot skeet, the Defendant contends there was no evidence of any plan involving violence toward any of the victims. Again, these are facts that were presented to the jury and apparently rejected. Thus, these claims have no merit.

Finally, the Defense notes that the jurors stated to counsel that they believed that had Vickers actually gone to the Defendant's house that night, the Defendant probably would have been the only person that could have stopped him because he had, on previous occasions, prevented him from committing suicide.

We initially note that the Defendant provides nothing to support his claim regarding the jurors' statements to counsel. The verdict in this case was eleven to one; thus, it is possible that the one juror who voted for acquittal may have made this statement. However, if more than one juror made this statement (as indicated by the Defendant's reference to "the jurors") it is inconsistent with the verdict returned in the case. We find the Defendant is not entitled to relief on this unsubstantiated information.

**E. Reasonable Hypotheses. The murders by Kenneth Vickers, Jr. were the results of what happened _that_ day.**

The Defendant claims that if there was believable evidence regarding the Sunday conversation in which the Defendant suggested harm to the victims, the events that occurred when Kenneth went to get his settlement check were so "explosive" and "triggering" that they ended any conspiracy that existed. The Defendant contends that those events were such an "intervening cause" that they negated any specific intent that might have previously existed.

In *State v. Lobato*, 603 So.2d 739, 746, (La.1992), the supreme court, addressing the admissibility of co-conspirators' statements under La.Code Evid. art. 801(D)(3)(b), stated:

32

A prima facie case of conspiracy is presented when the state introduces evidence which, if unrebutted, would be sufficient to establish the facts of the conspiracy. *State v. Nall*, 439 So.2d 420, 425 (La.1983). Statements made by co-conspirators which are the object of defense counsel's hearsay objection may be considered by the trial court in making its determination as to whether a prima facie case of conspiracy has been established. *State v. Myers*, 545 So.2d 981, 985 (La.1989).

After the state presents a prima facie case of conspiracy, the burden of proof shifts to the defendant to present evidence showing his withdrawal from the conspiracy prior to the time the statements were made by his co-conspirators. The conspiracy is presumed to continue unless or until the defendant shows his withdrawal from or the termination of the conspiracy. *United States v. Walker*, 796 F.2d 43, 49 (4th Cir.1986). To prove withdrawal, a defendant must show affirmative actions made by him which are inconsistent with the object of the conspiracy. *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Such affirmative actions include making a clean breast through confession to the authorities as well as notification to the co-conspirators of abandonment or withdrawal. *United States v. Patel*, 879 F.2d 292, 294 (7th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990).

Although *Lobato* involved a different issue, the factors provide a useful tool in determining whether a conspirator has withdrawn. The second circuit has applied these factors in a *Jackson* review. *See State in the Interest of W.T.B.*, 34,269 (La.App. 2 Cir. 10/20/00), 771 So.2d 807.

In the present case, there was no evidence presented to show the Defendant took any affirmative steps by confessing to authorities or notifying Kenneth of his withdrawal. His defense at trial was that he was not involved at all, not that he was initially involved and withdrew prior to the murders. As discussed previously, even if this court disregards Kenneth's testimony regarding his encounter with the Defendant on the night of the murders due to his intoxication, the conversation on the Sunday prior to the murders, the Defendant's actions after the murders and his statements to Anthony Fontenot that he gave Kenneth the gun and ammunition on the

33

night of the murders are sufficient to prove the Defendant's guilt beyond a reasonable doubt. We find this argument is meritless.

**F. Reasonable Hypothesis: Big Kenneth told Shelly Leger that Vickers had used David Leger's gun.**

The Defendant contends that Shelly Leger must have found out that the Defendant's gun was used from Kenneth Vickers, Sr., not Brenda West. He supports this hypothesis by noting that Shelly only knew of *two* murders, as did Kenneth Vickers, Sr., Ms. West knew that there were *three*. We note Shelly testified she spoke to Mr. Vickers before 10:05 p.m., the time the gun was reported stolen; however, she testified that she did not speak to Brenda West until 10:15 or 10:30 p.m., which was obviously after the report was made.

Shelly testified that she learned from Brenda West that the Defendant's gun was used. Mr. Vickers testified he did not know that night that his son used the Defendant's gun. He testified he learned that information months later. Based on the evidence presented, we find this is not a reasonable hypothesis of innocence. Accordingly, we find this claim has no merit.

**G. Reasonable Hypothesis: There was no Sunday meeting.**

The Defendant points out that the evidence of the Sunday meeting is unverified by any witness other than Kenneth and is denied by the Defendant. Additionally, the Defendant notes Kenneth provided different versions of what transpired at the Sunday meeting in his different statements. The Defendant also attacks the credibility of Anthony Paul Fontenot and Chad Gautreaux.

Again, all of these claims boil down to a credibility determination that was made by the jury not to be second-guessed by this court. The court finds these claims meritless.

34

## ASSIGNMENT OF ERROR NUMBER THREE

In this assignment of error, the Defendant contends the State failed to prove specific intent. Specifically, he contends that there was no "joining of the minds" nor any thought that Kenneth would ever "accomplish" such atrocities. Kenneth's success in carrying out the crimes cannot be considered a "concerted action" according to the Defendant.

First, we will restate the elements of the crime and the intent requirement. Again, Louisiana Revised Statutes 14:26(A) defines criminal conspiracy as follows:

> Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

In *State v. Smith*, 98-1323, pp. 4-5 (La.App. 3 Cir. 3/24/99), 737 So.2d 862, 864-65, *writ denied*, 99-2585 (La. 3/24/00), 757 So.2d 652, this court stated:

> "The term conspiracy generally means a plan by two or more persons to accomplish some unlawful, immoral, criminal or evil purpose." *Walker v. American Honda Motor Co. Inc.*, 93-1659, p. 4 (La.App. 3 Cir. 6/1/94); 640 So.2d 794, 796 [sic], *writ denied*, 94-1741 (La.10/7/94); 644 So.2d 644. Further:
>
> > In a conspiracy, it is the combination of at least two minds for an unlawful purpose which is the foundation of the offense. Conspiracy imports a corrupt agreement between not less than two people with guilty knowledge on the part of each. The clear purpose of LSA-R.S. 14:26 is to criminalize the conduct of two or more persons who intend a criminal act and as a result of that intention—manifested as an agreement or combination—one of these does something in furtherance of the intended criminal act.
>
> *State v. Lowery*, 609 So.2d 1125, 1129 (La.App. 2 Cir.1992), *writ denied*, 617 So.2d. 905 (La.1993). "It is essential to a conspiracy that there be a joining of two minds to accomplish a *concerted* action which has an unlawful purpose." *Id*. at 1130. *See State v. D'Ingianni*, 217 La. 945, 47 So.2d 731 (1950). Criminal intent to commit a specific offense must exist in at least two minds. *State v. Joles*, 485 So.2d 212 (La.App. 2 Cir.1986). Specific intent is defined as the state of mind which exists

35

when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act. La.R.S. 14:10(1). Intent may be inferred from the circumstances of the transaction and the actions of the defendant. La.R.S. 15:445; *State v. Boyer*, 406 So.2d 143 (La.1981); *State v. Beck*, 445 So.2d 470 (La.App. 2 Cir.), *writ denied*, 446 So.2d 315 (La.1984).

In support of his argument, the Defendant relies upon two cases. We find the first case, *State v. Jones*, 98-1520 (La.App. 3 Cir. 4/28/99), 741 So.2d 706, *writ denied*, 99-1576 (La. 2/11/00), 754 So.2d 927, is factually distinguishable. In that case, the defendant was convicted of conspiracy to possess cocaine with intent to distribute. The co-conspirator was deceased and thus unable to testify. After reviewing the evidence presented, this court concluded the State had not proven there existed an agreement between the defendant and the co-conspirator. Although the evidence indicated that both men may have been involved in drug dealing, there was no proof as to whether they conducted their activities separately or "acted in concert based on an agreement." *Id.* at 714. Assuming an agreement existed, this court found no evidence that the object of the conspiracy was to possess and distribute cocaine. Thus, it reversed the defendant's conviction.

In the second case cited by the Defendant, *State v. Lowery*, 609 So.2d 1125, 1130 (La.App. 2 Cir. 1992), *writs denied*, 617 So.2d 905 (La.1993), the second circuit stated:

> It is essential to a conspiracy that there be a joining of the minds to accomplish a *concerted* action which has an unlawful purpose. *See State v. D'Ingianni*, 217 La. 945, 47 So.2d 731 (1950). Criminal intent to commit a specific offense must exist in at least two minds. *State v. Joles, supra*. The fact that this defendant apparently obtained this marijuana from someone else who knew, because of the nature of the business of distributing marijuana, that the defendant was likely to transfer it to one or more other persons unknown to the person from whom the defendant obtained the marijuana is all that can be determined from the instant evidence. This is not a combination of minds to accomplish a *concerted* unlawful purpose sufficient to establish the offense of conspiracy to distribute marijuana.

36

In other words, the fact that the person from whom the defendant obtained the marijuana may have presumed that the defendant intended to distribute it to others does not amount to a conspiracy to distribute marijuana between the two. There must be sufficient evidence that the defendant's supplier specifically intended for the defendant to do certain and specific acts with the marijuana as part of a joint enterprise. The instant evidence does not rise to this level. Accordingly, the defendant's conviction for the offense of conspiracy to distribute marijuana is reversed and set aside.

The *Lowery* court reversed the defendant's conviction because the only evidence suggesting that others were involved was a statement by the defendant to police that he would not help "get" the other people.

We find the foregoing cases are distinguishable from the present case in that they lacked evidence that the parties were acting in concert based on an agreement. This court has had a case which is more similar factually to the instant case than the two cases cited by the Defendant.

In *State v. Texada*, 99-1009 (La.App. 3 Cir. 2/2/00), 756 So.2d 463, *writ denied*, 00-2751 (La. 6/29/01), 794 So.2d 824, this court upheld the defendant's conviction for conspiracy to commit first degree murder where the shooters, acting under the absent defendant's direction, and carrying guns provided by him, fired into a group of people.

We find the evidence in the present case is sufficient to prove that the Defendant was part of a conspiracy to commit murder. Even if this court were to disregard Kenneth's testimony regarding his conversation with the Defendant on the night of the murders due to his intoxication, this court is left with the fact that on the Sunday before the murders, the Defendant told Kenneth he could use his gun to commit suicide if he agreed to kill the three victims. Later in the conversation, the Defendant told Kenneth if he still wanted to use the gun, he could come by his house the following Wednesday night. The Defendant's actions after the murders indicated

37

he was a co-conspirator and the Defendant admitted to a friend that he gave the gun and ammunition to Kenneth that night. Additionally, the Defendant's argument that he never thought Kenneth would carry through with the murders is refuted by the fact that he told Kenneth that he was not worried because the gun was registered to Carlton Cooley. Clearly, there was an agreement by the Defendant and Kenneth to accomplish the murders of the three victims. We find this claim has no merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

The Defendant contends the trial court erred in refusing to grant a mistrial on four different occasions. Each will be discussed separately.

### A. The mention of a polygraph test.

First, the Defendant contends that a mistrial should have been granted when Detective Joe Demourelle testified that the Defendant had been called in for a polygraph examination. The Defendant contends that the State was aware of what Detective Demourelle's response would be when it asked the question because he was testifying from his notes. He contends that in this case of circumstantial evidence, the Defendant's credibility was critical and the mention of a polygraph test raised in the juror's minds the questions of whether the test was taken, what the results were, and why the results were not presented.

During trial, the State questioned Detective Joe Demourelle about the statements he took from the Defendant. In the process of asking the detective about his second interview with the Defendant, the contested statement was made. The colloquy at issue is as follows:

> Q. Okay. After...um...interviewing him that first time did you have occasion to go back and speak with him again?
>
> A. Yes, I did.
>
> Q. And when was that?

38

A. He came to my office at a later date and he was interviewed a second time. I don't remember the date.

Q. Okay. I didn't ask you if you had taped the first statement, but did you tape the first statement?

A. Yes.

Q. Okay, and then this second statement whenever he came in to speak with you, did you tape that statement as well?

A. Yes, I did.

Q. Okay, and on...um...this second occasion whenever he came in to speak to you...um......what questions did you ask?

A. Uh...basically about his move...movements that day, and whether Kenneth had come to the house, and who was at his house, uh....names, addresses, and telephone numbers of the people that were there to determine...uh...to locate them so we could interview them, and...uh...and also asked him if he would submit to a polygraph examination.

Defense counsel objected to the reference to the polygraph examination, arguing that the prosecutor was aware that this information was going to come out because it was contained in the statement she had in front of her. One of the comments made by the court during the discussion of this objection was "[s]he didn't ask him."

On appeal, Defendant argues that it is clear from an examination of Detective Demourelle's notes that the prosecutor knew what he was going to say. These notes were attached as an exhibit to the Defense's motion for post-verdict judgment of acquittal but they were not introduced at trial.[16]

The court finds the reference to the polygraph test did not mandate a mistrial in this case. First, it appears the answer was not intentionally solicited by the State.

---

[16]This court ordered all exhibits introduced at the hearing on the motion for post-verdict judgment of acquittal and motion for new trial and found the notes were not introduced at that hearing. If the notes had been introduced at that hearing, we find there would still have been an issue as to whether they could be considered by this court since they were not introduced at trial when the objection was made.

Even assuming it was, we find the reference to the polygraph examination would not constitute reversible error in this case.

In *State v. Legrand*, 2002-1462, pp. 10-11 (La. 12/3/03), 864 So.2d 89, 98, *cert. denied*, __ U.S. __, __ S.Ct.__ (2005)(alteration in original)(footnote omitted), the supreme court stated:

> This Court has long adhered to the view that lie detector or polygraph test results are inadmissible for any purpose at the trial of guilt or innocence in criminal cases. Consistent with this view, the Court has "made it clear" that the rule excluding polygraph evidence "also operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony." *State v. Hocum*, 456 So.2d 602, 604 (La.1984); *State v. Tonubbee*, 420 So.2d 126, 132 (La.1982), *cert. denied*, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); *State v. Davis*, 407 So.2d 702, 706 (La.1981); *State v. Catanese*, 368 So.2d 975, 981 (La.1979). Such evidence is prohibited because it "invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully." *Hocum*, *supra* at 604-605. Moreover, this Court has held that polygraph information and test results are inadmissible "either as substantive evidence or as relating to the credibility of a party or witness." *State v. Humphrey*, 445 So.2d 1155, 1158 (La.1984) (quoting *Tonubbee*, *supra* at 132).
>
> However, "[e]ven though any reference to the results of a polygraph test would be improper, an appellate court will not automatically reverse a conviction whenever an impermissible reference to a polygraph exam is made during a criminal trial." *State v. Womack*, 592 So.2d 872, 881 (La.App. 2 Cir.1991), *writ denied*, 600 So.2d 675 (La.1992). A reversal and new trial are required only if there is a reasonable possibility that the error complained of might have contributed to the conviction. *Hocum, supra* at 604-605; *State v. Semien*, 566 So.2d 1032 (La.App. 3 Cir.1990), *writ denied*, 569 So.2d 960 (La.1990).

It is clear that polygraph test *results* are inadmissible. We reviewed *Hocum*, *Tonubbee* and *Catanese* as well as the cases cited by the Defendant in support of his argument. We find the cases are factually distinguishable in that they concern the admissibility of results or the fact that a test was taken.

The Defendant cites *State v. Davis*, 351 So.2d 771 (La.1977), as the leading case for circumstances similar to those in the present case. In *Davis*, the State's chief

witness, on cross-examination by the defense, unresponsively mentioned that she was taken to have a lie detector test. On redirect examination, the prosecutor elicited testimony that the witness had taken a polygraph exam and returned to work. Additionally, the state brought out the fact that the witness continued her employment for several months after the robbery, quit due to pregnancy, and planned to return after the birth of her child. The court concluded:

> After a careful examination of the entire record and review of our prior holdings as well as those of other jurisdictions, we are forced to conclude that not only was error committed but that the error committed substantially prejudiced the defendant and was, therefore, reversible. LSA-C.Cr.P. art. 921. In the present case, by eliciting impermissible testimony to the effect that the witness had taken a lie detector test and establishing that she had been retained in her employment, the State created the impression that the witness took the test; told the truth; and, therefore, was testifying truthfully at the trial. In our opinion, this represents a substantial evasion of the prohibition against lie detection testimony. In the case before us, the impermissible testimony was so prejudicial as to require reversal. LSA-C.Cr.P. art. 921.

*Id.* at 774.

We find *Davis* is distinguishable because the jury was made aware that the victim had actually taken a lie detector test and presumably, passed it; whereas here, nothing more than the fact it was offered was placed before the jury.

In an early case decided by the supreme court, *State v. Refuge*, 270 So.2d 842 (La.1972) (also cited by the Defendant), the trial court allowed testimony as to whether a lie detector test had been given to a witness. After acknowledging that results, as a rule, are inadmissible, the supreme court stated:

> Moreover, because of the reasons for which the test itself is inadmissible, these same authorities summarize the uniform holdings to be that likewise inadmissible is the willingness or unwillingness of a witness or a party to submit to such examination, as is evidence that the test was administered. Such evidence is excluded as an attempt by indirection to evade the direct prohibition against lie-detection testimony for jury consideration, based upon the incompetency and unduly prejudicial effect of such testimony in judicial proceedings.

41

*Id.* at 844.

In the present case, the challenged testimony concerned questioning the Defendant about whether he would submit to a polygraph examination, not whether he was willing or unwilling, or whether the test was actually given. Thus, we find *Refuge* is close, but not directly on point.

In *State v. Landry*, 502 So.2d 281 (La.App. 3 Cir.), *writ denied*, 508 So.2d 63 (La.1987), the defendant contended a mistrial should have been granted when a police officer referred to a polygraph examination in his testimony. This court stated:

> Evidence of a polygraph examination or any reference thereto during trial is inadmissible in Louisiana. *State v. Catanese*, 368 So.2d 975 (La.1979); *State v. Hocum*, 456 So.2d 602 (La.1984). However, the fact that the witness made reference to a polygraph test does not warrant a mistrial where no evidence was introduced to show the test results or the circumstances surrounding the taking of the test. *State v. Tonubbee*, 420 So.2d 126 (La.1982), cert denied, 460 U.S. 1081, 103 St.Ct. 1768, 76 L.Ed.2d 342 (1983).

*Id.* at 289.

In *Landry*, the contested testimony was given as part of a nonresponsive answer, there was no showing of bad faith by the state and the testimony did not indicate who took the polygraph examination or its results. Under these circumstances, this court found any error that might have occurred was harmless given the fact the substantial rights of the defendant were unaffected.

Although *Landry* is close, the present case is distinguishable because it is clear that it was the Defendant who was asked to take the test. However, as in *Landry*, no evidence was introduced to show the test was taken, or if so, the results. Even if error did occur in this case, we find there is not a reasonable possibility that the error contributed to the conviction. Detective Demourelle's statement that the Defendant was asked to submit to a polygraph examination without more can hardly be said to have contributed to the verdict. Kenneth Vickers' testimony, the Defendant's

behavior shortly after the murders, and his statements to Anthony Fontenot clearly point to the Defendant's guilt. We find this claim has no merit.

**B. The State presented what it knew was perjured testimony of Kenneth Vickers, Jr. who had given no less than four totally differing statements.**

The Defendant adopts the arguments set forth in his pretrial writ application on this issue. Although he states that his argument may have been premature at the time the application was filed, he contends it is no longer speculative because we are now aware of the content of Kenneth's testimony. The Defendant contends Kenneth's testimony was perjured in that it differed from his testimony at a bond hearing, his unsworn statement to the District Attorney's Office as part of a plea bargain, his statement to Joe Demourelle eight days after the murders, and from his confession to his sister and brother-in-law minutes after the murders.

In *State v. Hebert*, 97-1742, p. 9 (La.App. 3 Cir. 6/3/98), 716 So.2d 63, 67-68, *writ denied*, 98-1813 (La. 11/13/98), 730 So.2d 455, *cert. denied*, 529 U.S. 1072, 120 S.Ct. 1685 (2000), this court, *(quoting State v. Magee*, 93-643, p. 2 (La.App. 3 Cir. 10/5/94), 643 So.2d 497, 499) stated:

> The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion. *State v. Fontenot*, 550 So.2d 179 (La.1989); *State v. Decuir*, 599 So.2d 358 (La.App. 3rd Cir.1992), *writ denied*, 605 So.2d 1095 (La.1992). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. *See, e.g., State v. Regan*, 601 So.2d 5 (La.App. 3rd Cir.1992), *writ denied*, 610 So.2d 815 (La.1993); *State v. Wright*, 564 So.2d 1269 (La.App. 4th Cir.1989). Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. *State v. Decuir, supra*, at 360.

In his pretrial writ application, the Defendant claimed the lower court erred in failing to suppress Kenneth's testimony because he contended the only way the State could "get anything out of Kenneth Vickers, Jr.," would be to impeach him with some

43

prior inconsistent testimony or ask leading questions. The Defense argued that neither scenario was allowed by law and that the State should not be allowed to call him as a witness. The Defendant claimed that without being able to lead or impeach Kenneth's testimony, the State would have no case at all.

In his brief on appeal, it appears the only new "evidence" the Defendant presents is the entirety of Kenneth's trial testimony. Although the Defendant adopts the argument set forth in his pretrial writ, he does not reference, and thus, we assume, does not question, the way in which the prosecutor conducted his examination of Kenneth at trial. On appeal, the Defendant contends that Kenneth's testimony was perjured in that it varied from statements he had previously given.

In *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992), this court stated:

> When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

We find the differences in the various statements given by Kenneth was a credibility call to be made by the trier of fact, and it should not be disturbed by this court on appeal.

**C. Permitting the State to "wave" the inadmissible written statement of Chad Gautreaux before the jury.**

The Defendant claims the State, in an effort to buttress the testimony of Chad Gautreaux, asked him whether he had previously provided the same information in his statement to police. The Defense contends the prosecutor waved the referenced

statement in front of the jury so it would know such a statement existed.[17]   The

Defendant provides no record page references in support of his claim.  We reviewed

Mr. Gautreaux's testimony and did not find any objection of this nature.  The record

page references provided by the State indicate this objection was actually made

during the testimony of Anthony Paul Fontenot.

The prosecutor asked Mr. Fontenot whether the statement he gave was

recorded.  When he indicated that it was, the prosecutor said, "I'm gonna show you

something, okay?"  The jury was removed from the courtroom and the motion for

mistrial for the "waving" of the document was as follows:

> By Attorney A. Bruce Rozas: ...may I please the Court.  Number one, if that's the purpose what flash this thing for?  This is the second time, Your Honor, that she flashes something in front of the evidence.  Would she tell what was the purpose of flashing this, this statement?  The supplemental discovery would give the date.  The court...official court document, that was the way to do it...to say, Mr. Rozas, I gave you this notice on the day...again, she wants to buffet.  She wants to support her statement by saying to the Jury, no, we have a recorded statement from you.  What was the purpose of asking the recorded statement?  What was the purpose of this?  To establish a date, she had fifteen ways that any lawyer, including a competent lawyer like her would know.  No, Judge, it's to prejudice the Jury.  Again, the second time in the same trial she waives evidence that she knows is inadmissible to the Jury to buffet a witness in prejudice of the defendant.  I have to ask again for a mistrial based on that.  I can't get around it.  She didn't give me the statement.  Now, she says she has no intention of introducing it.  What, then, other than prejudice was the purpose of waiving it to the Jury?

> By ADA Meyers: Your Honor, I would like the record to reflect that I did not waive a statement to the Jury.  Never in the course of these proceedings have I waived a statement to the Jury.  I have picked a statement up off of my desk and asked the Court to approach the witness.  I didn't even look at the Jury and I want the record to reflect that cause he's mischaracterizing my...uh...my gestures.  He mischaracterizing what I've done in this courtroom and I want the record to be clear on that issue.

---

[17]The Defense mentions in its brief that the State waved the statement in front of the jury "despite the fact that the State had religiously guarded the statement and refused to provide it to counsel in discovery."  We note the Defense's brief mention of this issue does not appear to rise to the level of a *Brady* claim; as such, it has not been further addressed.

> By Attorney A. Bruce Rozas: I'll be satisfied if the Court will describe what the Court saw her do.

> By the Court: What the Court saw was to see Ms. Meyers lift the statement to indicate what she had, at least to me, and then she asked to approach the witness. She did not waive it to a Jury. I did not see that.

> By Attorney A. Bruce Rozas: But she had it in front of her, in her hand, and...inaudible....

> By the Court: She had it in her hand. As I said she lifted it.

Defense counsel stated to the judge that he would be satisfied if the jury would be instructed to disregard the document because it was not in evidence. The judge again stated that the prosecutor did not wave the statement in front of the jury and he did not believe that was grounds for a mistrial. He instructed the jury as follows:

> By the Court: . . . there was a...a document that...that...uh...you might have seen that Ms. Meyers had...uh...I want you to disregard any reference that might have been made to that document or the presence of that document. It has no place in this trial and is of no importance to you in making your decision.

The court finds this claim has no merit. The judge stated that he did not see the prosecutor wave the statement in front of the jury; however, as a precautionary measure, and at the request of the Defense, he instructed the jury to disregard the document.

### D. Admitting the hearsay testimony of the child on rebuttal.

The Defense contends the State should not have been allowed to call Mrs. Helen Gautreaux's granddaughter on rebuttal to present double hearsay testimony. The Defendant contends Mrs. Gautreaux was a crucial witness because she established that Kenneth went to the Defendant's house the afternoon of the murders and thus had the opportunity to steal the gun used to commit the murders. Defense counsel notes that he objected to the State's failure to lay a proper foundation, "namely, to question Ms. Gautreaux directly as to whether such statement had been

46

made." Additionally, he contends the statement was "hearsay upon hearsay" and was inadmissible. If allowed, he contended it would be more prejudicial than probative. The Defendant contends that despite these objections, the trial court allowed the testimony, which, in his opinion, was clearly error. We note Defense counsel cites no law in support of his argument.

During the State's cross-examination of Mrs. Gautreaux, the prosecutor asked her whether she had stated to anyone that she would lie for the Defendant about whether he was involved in the murders or not. The colloquy and the Defense's objection are as follows:

> Q. . . . Have you ever made any statements to anyone that whether David was involved in this or not, that you would lie for him?
>
> A. No I did not.
>
>                   BY MR. ROZAS: Oh objection Your Honor.
>
> Q. You've never made that statement?
>
> A. No I did not.
>
>                   BY MR. ROZAS: Objection Your Honor.
>
>                   BY THE COURT: Overruled.
>
>                   BY MR. ROZAS: We would ask when, who, how, before the statement.
>
>                   BY MS. MEYERS: She denied that she made it.
>
>                   BY THE COURT: Continue uh. . .

In its case in rebuttal, the State called Samantha Gotreaux (as spelled in the record) for impeachment purposes. The defense objected on the basis that a witness cannot be impeached with hearsay testimony. The judge addressed the issue outside the presence of the jury and ruled that the testimony was admissible for "the purpose of the utterance not toward the truth of the matter. . . ."

47

Samantha testified that in June of 2002, she heard her grandmother Helen Gautreaux talking about the murders and she heard her say that "she'd lie for David whether he did it or not." At the conclusion of Samantha's testimony, the judge instructed the jury as follows:

> I need to instruct you that the statement that you...that Samantha just attributed to Ms. Gotreaux is to be used by you merely for the fact that the statement to be considered with regard to the fact that the statement was made, not necessarily to the truth of the statement, but only the utterance of the statement. That's the limited purpose that you should consider this and evaluate it as you see fit.

In *State v. Patterson*, 99-27, pp. 3-4 (La.App. 3 Cir. 6/30/99), 742 So.2d 50, 52-53, this court stated:

> A hearsay statement is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. La.Code Evid. art. 801(C); *State v. King*, 355 So.2d 1305 (La.1978). Hearsay is generally not admissible, unless subject to an exception found in the Code of Evidence or provided for by the legislature. La.Code Evid. art. 802. Two important hearsay exceptions encompass testimony given at trial that is inconsistent with prior statements made by the witness. . . .

> Prior inconsistent statements are also considered admissible when used solely to impeach or attack a witness' credibility. La.Code Evid. art. 607 provides a proponent may attack the credibility of a witness through the use of extrinsic evidence which contradicts the witness' testimony, provided that a proper foundation is laid for such extrinsic evidence as provided by La.Code Evid. art. 613. La.Code Evid. art. 613 states that extrinsic evidence of a prior inconsistent statement is admissible if the proponent fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so. La.Code Evid. art. 613; *State v. Smith*, 687 So.2d 529 (La.App. 3 Cir.1996); *State v. Roy*, 502 So.2d 265, 268 (La.App. 3 Cir.1987).

> Louisiana Code of Evidence Article 607 provides, in pertinent part:

> D. **Attacking credibility extrinsically**. Except as otherwise provided by legislation:

> . . . .

> (2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is

48

admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

In *State v. Owunta*, 99-1569, p. 1 (La. 5/26/00), 761 So.2d 528, 529 (alteration in original), the supreme court stated:

> Louisiana has long sanctioned the impeachment of a witness in criminal trials by his or her prior inconsistent statements. La.C.E. art. 607(D)(2); former La.R.S. 15:493; *State v. Gabriel*, 450 So.2d 611, 616 (La.1984); *State v. Mosely*, 360 So.2d 844, 845 (La.1978); *State v. Rudolph*, 332 So.2d 806, 813 (La.1976). Provided that the witness has had a fair opportunity "to admit the fact and has failed distinctly to do so," La.C.E. art. 613, extrinsic evidence of the statement is admissible, not to prove the truth of the matter asserted, *i.e.*, not for its hearsay content but, to establish the fact of contradiction as a means of impeaching witness's general credibility. *State v. Cousin*, 96-2973, p. 8 (La.4/14/98), 710 So.2d 1065, 1069. In this regard, Louisiana has followed the minority rule that such prior inconsistent statements "simply do not constitute substantive evidence." *State v. Allien*, 366 So.2d 1308, 1311 (La.1978); *cf. California v. Green*, 399 U.S. 149, 164, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489 (1970)("[T]here is little difference as far as the Constitution is concerned between permitting prior inconsistent statements to be used only for impeachment purposes, and permitting them to be used for substantive purposes as well.").

The supreme court has outlined the balancing test to be applied when prior inconsistent statements are used to impeach credibility:

> The right to use the prior statement depends upon the probative value of the statement as to the credibility of the witness' in-court testimony, as measured against the prejudicial impact that potentially may result from the jury's improper use of the evidence. *Weissenberger, supra*, at § 607.3. In performing the weighing process, the court should consider the relevancy of the prior statement to the credibility of the in-court testimony and the motivation for the impeachment. The court should further consider the prejudicial effect of the statement if used improperly as substantive evidence, and the effectiveness of a limiting instruction in avoiding improper use of the statement. *Id*.

*State v. Cousin*, 96-2973, p. 11 (La. 4/14/98), 710 So.2d 1065, 1071.

We find the trial court did not err in allowing the State to present Samantha's testimony to impeach Helen Gautreaux's credibility. The prior statement was relevant to the credibility of Mrs. Gautreaux's testimony. The trial court provided a

49

limiting instruction to the jury, and even if used improperly as substantive evidence, the prejudicial effect would be minimal in that it would have essentially the same effect, i.e., damage to Mrs. Gautreaux's credibility. We find there is no error in the trial court's ruling.

We find the Defendant's argument on appeal regarding the foundation for the admission of the evidence seems to be limited to the State's failure to "question Mrs. Gautreaux directly as to whether such statement had been made." As evidenced by the colloquy above, this is factually incorrect. Mrs. Gautreaux was specifically asked whether she had made such a statement. The court does not interpret counsel's argument on appeal as being that advanced at trial, i.e., "[w]e would ask when, who, how, before the statement."

## ASSIGNMENT OF ERROR NUMBER FIVE

The Defense claims the trial judge erred in refusing to grant challenges for cause as to two close friends of the victims. Defense counsel contends that his challenges for cause as to jurors Eva Ardoin and Donna Jackson should have been granted. According to the Defendant, both worked at a country store frequented by the Defendant, Kenneth Vickers, the victims, and their families, and having to sit on the jury would cause them such concern as to prejudice their verdicts.

The Defendant must exhaust all peremptory challenges for this court to review the trial judge's denial of a challenge for cause. *See State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So.2d 162, *cert. denied*, 528 U.S. 1050, 120 S.Ct. 589 (1999).

The court's review of the list of challenges of prospective jurors indicates the Defense used all twelve of its peremptory challenges. Thus, we will address the propriety of the trial judge's denial of the two challenges for cause.

50

Eva Ardoin testified she managed a store in Pine Prairie and she knew the Defendant, the Vickers, and two of the victims, Brandy and Michelle, as customers of the store. She characterized the two victims as casual acquaintances. Although many of Ms. Ardoin's responses were inaudible, it is clear from the prosecutor's comments to her that Ms. Ardoin had heard about the case. Ms. Ardoin said she had heard rumors and she heard that Kenneth Vickers had killed the three women, confessed, and pled guilty. She was asked whether she heard some things that the other prospective jurors may not have that would put her in "a situation" and she responded "no."

When asked whether she could follow the law and consider only evidence that came from the witnesses, she testified she would try to do her best. Later, Ms. Ardoin affirmed that she could put her personal feelings aside and make her decision from the evidence and the applicable law. At a later point, she said she hoped she could put her prior knowledge of the case aside, but she said "it's just hard."

At one point in her testimony, Ms. Ardoin indicated that the fact she knew the two families involved would make her uncomfortable:

> By Attorney A. Bruce Rozas: . . . Was the question I asked the other guy is you have to go back into the community. Would...would...would the fact that your gonna have to go back and maybe face...uh...uh...the families of them, the Legers, the, you know, the Vickers, and...and would that cause you some...some concern about being extra dilig...diligent in your decision or...or would it cause you to maybe lean one way or the other in a situation where you wouldn't be talked about or questioned about for your verdict? Would it be? Would that cause you some problems while your sitting in the box, either one of you?
>
> By Prospective Juror #7, Eva G. Ardoin: Yes, I would be very uncomfortable, very nervous, being around them.
>
> By Attorney A. Bruce Rozas: Because of what your decision....
>
> By Prospective Juror #7, Eva G. Ardoin: Cause I know...it's cause I know these people.

51

By Attorney A. Bruce Rozas: Sure, and whatever you would have done, say, yea or nay, okay, guilty or not guilty, then someone on the other side being...depending on what side, may say why'd you do that or the other side say oh, you did good, you know,....

By Prospective Juror #7, Eva G. Ardoin: ...inaudible...

By Attorney A. Bruce Rozas: You don't want that. You don't want compliments and you want criticisms?

By Prospective Juror #7, Eva G. Ardoin: No, sir.

By Attorney A. Bruce Rozas: Right, and...and you would know that sitting in the jury while say, for instance, say the jurors are mixed...it's out of...it's of no concern to them, you know, the people where they're going to don't know the Vickers or the Legers from zip or zap, okay. That...you see the difference?

By Prospective Juror #7, Eva G. Ardoin: Yes, sir.

By Attorney A. Bruce Rozas: You think it would cause you a problem?

By Prospective Juror #7, Eva G. Ardoin: I think it would.

Donna Jackson testified that she is a store clerk at a store in Pine Prairie and that she knew the Defendant from waiting on him in the store. She also indicated that she knew some of his stepchildren because she has children the same age. When asked if her knowledge of them would prevent her from being fair to him or the State, she replied "I will try, yes." The prosecutor then asked whether she thought she would be able to "overcome" and Ms. Jackson replied, "Yes, cause I know I'm not close." Ms. Jackson affirmed that she could put her emotions aside and decide the case based on the evidence and law presented. Ms. Jackson testified that she too had heard about the case, but she said it would not cause her to form an opinion about it. She affirmed that she would be able to put aside what she had heard and judge the case on the evidence. However, like Ms. Ardoin, Ms. Jackson testified that it would make her uncomfortable to serve knowing she would have to go back into the community where these people live.

52

Before recessing to entertain challenges, the judge addressed Ms. Ardoin and Ms. Jackson as follows:

> By the Court: I want to make sure I understand something. Ms. Ardoin and Ms. Jackson, I know it sounds like we're picking on you and we're not. We want to make sure that we all understand your positions and...and believe me I think all of us can kind of put ourselves in your positions, but I can tell you that, for example, in my job, a lot of times I know both...both sides and...uh...I have to go into places where I have to rule one way for one side and they're there. I know a lot of people sitting out here in the audience. I know a lot of people sitting right there in that box with you, but I do my job and I follow what the law says to do and I'm assuming that both of you, even though your uncomfortable, can do your duty as a juror and you can look at this fairly and impartially and just judge the evidence presented here without regard to what's gonna happen afterwards, what happened before. You have to be able to do that. Can you do that, Ms. Jackson?
>
> By Prospective Juror #84, Donna Kay Jackson: Yes.
>
> By the Court: Ms. Ardoin, can you do that...
>
> By Prospective Juror #7, Eva G. Ardoin: ...inaudible...(can do it)
>
> By the Court: ...even though it won't be fun, I know? Alright. Thank you both very much. I appreciate it.

Both jurors were challenged for cause by the Defense. The judge stated that he did not envy their position, but he was not going to grant the challenges.

Louisiana Code of Criminal Procedure Article 797 provides in pertinent part:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> . . . .
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
>
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

In *State v. Owens*, 567 So.2d 806, 809 (La.App. 3 Cir. 1990), *writ denied*, 94-1343 (La. 8/23/96), 678 So.2d 29, this court stated:

> A charge of bias or impartiality may be removed if a witness is rehabilitated. A prospective juror can be rehabilitated if the trial court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. *State v. Gibson*, 505 So.2d 237 (La.App. 3rd Cir.1987), writ denied, 508 So.2d 66 (La.1987). The trial court has wide discretion in ruling on a challenge for cause, and its ruling will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Gintz*, 438 So.2d 1230 (La.App. 3rd Cir.1983).

In support of his position, the Defendant cites *State v. Brown*, 496 So.2d 261 (La.1986). In *Brown*, a prospective juror testified that although he did not know the victim, his son played on the same baseball team with the victim's son. He also testified that he had visited with the victim's family in the bleachers. Additionally, the victim's parents and "two of their sons" (presumably the victim's sons) attended a party for the baseball team at the prospective juror's house. The following question was posed to the prospective juror regarding a potential problem if he served on the jury:

> "Q . . . let's say you sat on this trial and you voted for guilty of first degree murder. Then you turned around and voted to let Bryan Brown live. Would that . . . cause you problems next summer when you met these folks at the ball park?
>
> A Possibly would."

*Id.* at 265(alteration in original).

The supreme court held, "When a prospective juror admits to having a personal relationship with the victim or the victim's family, it is unrealistic to believe the juror could be impartial in his or her deliberations concerning the defendant's guilt or innocence." *Id.* at 265. Thus, the court concluded the trial court erred in denying the challenge for cause.

We find *Brown* is distinguishable in that the relationship between the prospective juror and the victim's family was closer than the situation in this case. From the voir dire questioning of Ms. Ardoin and Ms. Jackson, it seems that their acquaintance with the parties involved in this case was from waiting on them at the stores where they were employed. Additionally, although Ms. Jackson knew some of the Defendant's stepchildren because she has children their ages, she did not indicate that there was any kind of relationship between the two families.

In *State v. Gibson*, 505 So.2d 237 (La.App. 3 Cir.) *writ denied*, 508 So.2d 66 (La.1987), the defendant contended on appeal that a prospective juror should have been excused because he was a social acquaintance of the victim[18] and a good friend of his family. This court found the trial court did not abuse its discretion in refusing to grant the challenge for cause because the juror stated he could put his knowledge of the victim and his family aside and decide the case on the evidence presented.

In *State v. Jackson*, 548 So.2d 57 (La.App. 3 Cir. 1989), *writ denied*, 95-2871 (La. 10/11/96), 680 So.2d 652, a prospective juror testified that the victim visited her shop several times after the incident, an armed robbery. The victim discussed his injuries, but not the details of the offense. The prospective juror's son was also a friend of the victim's, but the juror said neither this nor her knowledge of the victim from the store would cause her to be biased. She said she would be fair and impartial and could render a verdict based on the evidence presented. This court concluded:

> The responses by Mrs. Dunagan do not suggest circumstances which would lead to the reasonable conclusion that she would be influenced in arriving at a verdict. The fact that Roge entered the juror's place of business on occasion does not lead to an implication of partiality. The voir dire questioning did not elicit facts suggesting that the relationship between the juror's son and Roge would lead to juror bias. Under these circumstances, it does not appear that the trial judge abused his wide discretion in denying Jackson's challenge for cause.

---

[18] The juror stated he and the victim had not visited each other's homes.

*Id.* at 59.

In *State v. Owens*, 567 So.2d 806, a prospective juror's daughter briefly attended school with the victim, but they were not closely associated. The prospective juror had heard of the case, but testified that she would have no problem trying to be impartial. She "testified that her relationship with the victim and her family 'might' remain in her mind during the trial and sympathy 'might' arise during the trial"; however, during questioning by the court, she said she would attempt to set aside any sympathy for the victim and would render a verdict based on the evidence and the court's instructions. *Id.* at 809. This court found the trial court did not abuse its discretion in denying the challenge for cause because the trial court rehabilitated the prospective juror and felt she would render an impartial verdict based on the evidence and court's instructions.

This court finds the trial judge did not abuse his discretion in denying the two challenges for cause. Although both women had heard about the case and stated they would be uncomfortable serving on the jury due to the fact they knew either the victims or members of the Leger and Vickers families, there is no indication that they were more than acquaintances. Both prospective jurors indicated to the judge that they would be able to be impartial and judge the evidence presented. This assignment of error is without merit.

**ASSIGNMENT OF ERROR NUMBER SIX**

The Defense contends the "hopelessly deadlocked jury" was "starved" into a compromise verdict. He contends that from 11:00 a.m. until 9:15 p.m., the jury had nothing to eat. After approximately three hours of deliberation, around 6:00 p.m., the jury announced it was deadlocked. It made the same announcement at 7:10 p.m., according to the Defendant. At that point, the judge asked them to take a break, enjoy

a meal and reconsider. According to the Defendant, this was done without informing the jury what, if any, provisions would be made for them if they needed to stop for the night. Additionally, he contends the jury was led to believe, by questions from the bailiff regarding what they wanted their spouses to be told, that they were going to be doing an "all nighter." The Defendant contends that the jury was not informed that they would be allowed to break for the night, so they had to believe that they needed to make a decision that night. The Defense maintains that the fact that a verdict was returned shortly after the jury was deadlocked shows that they believed they *had* to deliberate, possibly all night, and without additional food until they reached a decision.

Although the times are not revealed in the record, when the jury first returned and announced it was deadlocked, the judge noted that they had been deliberating for approximately three hours. He encouraged them to take a break, eat something and clear their heads. The judge noted that the police jury president was present and he would be "more than happy to buy [them] supper." The judge informed the jury that the bailiff would bring them a menu and he said, "At least get a meal out of this and then after that if . . . if everything's the same report to me. If ya'll can deliberate some more that'd be my first choice. So please humor me and do that...at least that much." The jury then returned with its verdict.

In response to this allegation, the trial judge issued a per curiam stating that defense counsel's allegations regarding the treatment of the jury are false. The judge explained:

> Mr. Rozas states that "(a)t no time did the court, on the record or otherwise, inform the jury that they would be allowed to break for the night, be furnished a motel room to rest, and then, fresh and fed, return for deliberation the following day." This statement is simply false. At or near 7:00 o'clock that evening, the court inquired as to the progress of deliberations in order to determine whether to order food and to make

57

accommodations. The jurors were definitely informed that a meal would be provided and that a room would be provided at a local motel if needed. Food was ordered immediately thereafter from a local restaurant and was served to the jury immediately upon arrival. Telephone numbers were taken by the bailiff so that the court could inform family members of the whereabouts of the jurors.[19]

Defense counsel filed a response to the judge's per curiam in which he again

questions whether the jury was offered overnight accommodations. He states that he

_____

[19]We note when this issue was discussed at the hearing on the motion for new trial, the court stated:

> BY THE COURT: . . . . you should be made aware that they were offered a meal and...declined it. They were given a meal. They were ordered...the meals were ordered at approximately 7:30 that evening. It was far from ten hours. Also, they were told that they could have a room reserved for them and they would be allowed to go and rest, even though you indicated it would an all nighter which is not at all the case, and they can have sworn testimony if you need it.

The judge informed defense counsel that his facts were incorrect and if that if he misstated the facts to this court, the judge would bring it to this court's attention.

At the hearing on the motion for new trial, defense counsel stated that he was relying on his memory in arguing this issue and that the record would show whether his memory or the judge's was correct. In response, the judge stated:

> BY THE COURT: No...no the record will prove what happened because I'll get my bailiff to go on the record cause he communicated what I just told you directly to the ... to the jury and it's not on the record when you communicate that way, and that's why you're going beyond the record not knowing what communications existed.

> BY MR. ROZAS: Either way Judge I don't know what he told them.

> BY THE COURT: If you'd like you can ask and I'll tell you what he told them or we can put him on the record and he can tell you what he told them, but you don't even ask. You're just saying what you think was told. That's not what was told.

> BY MR. ROZAS: Judge again I'm ... we will have the record Judge and I'm gonna be constrained to the record as all attorneys are and that's...that's what I'm gonna do is go by the record.

does not want "to debate with the Court as to what the facts were and would, instead, refer to the record itself."

Counsel correctly notes that there is no mention on the record of hotel accommodations from the time the jury first began deliberating until they returned with their verdict. He states, "as to what the bailiff may or may not have further told the Jury, we don't know, because those conversations are not of record. We agree with the trial court that we are all bound by what is in the record and not by our interpretation or recall of how it reads."

The court finds it improper to consider the per curiam of the comments of the trial court at the motion for new trial and relies on the record only in denying relief because the record does not support counsel's allegations. The record indicates that the judge offered the jury a meal and he encouraged them to eat and take a break before they resumed deliberations. Although the record contains no mention of hotel accommodations, this is not proof that they were not offered. This unsubstantiated claim is denied.

## ASSIGNMENT OF ERROR NUMBER SEVEN

For his final assignment of error, Defendant alleges the trial court erred when it sentenced him to twelve years on each of the three convictions and ordered the sentences to be served consecutively, for a total term of imprisonment of thirty-six years at hard labor.

Defendant was sentenced on May 24, 2004. On June 4, 2004, Defendant filed a motion to reconsider the sentences. On June 22, 2004, following a hearing on Defendant's motion, the trial court denied the motion.

In his motion to reconsider, Defendant argued that not only did the trial court fail to give a factual basis for the sentences it imposed, but that the trial court did not

59

comply with the requirements of La.Code Crim.P. art. 894.1 when it considered the sentences it ordered Defendant to serve.

This court has held that when reviewing a sentence, the only relevant question is whether the trial court abused its considerable discretion when it imposed the sentence. *State v. Morrison,* 99-1342 (La.App. 3 Cir. 3/1/00), 758 So.2d 283. *See also State v. Cook,* 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied,* 519 U.S. 1043, 117 S.Ct. 615 (1996). Defendant was convicted of three counts of conspiracy to commit murder. Louisiana Revised Statutes 14:26(B) provides:

> Whoever is a party to a criminal conspiracy to commit any crime shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; provided, however, whoever is a party to a criminal conspiracy to commit a crime punishable by death or life imprisonment shall be imprisoned at hard labor for not more than thirty years.

Defendant was sentenced to twelve years on each count, less than one half of the sentence the trial court could have lawfully imposed. Further, in *Morrison,* 758 So.2d at 285, this court held:

> In order to insure adequate review by the appellate court, there must be an indication in the record that the trial court considered both the aggravating and mitigating factors set forth in La.Code Crim.P. art. 894.1 in determining the defendant's particular sentence. *State v. Davis*, 449 So.2d 452 (La.1984). It is well established that the trial court need not articulate every factor of Article 894.1. However, the record must establish that the terms set forth therein have been adequately considered. The record must reveal some indication that the trial court considered the guidelines set forth in Article 894.1.

At the sentencing hearing, the trial judge stated for the record:

> The Court is called upon to sentence the defendant, Mr. David Lee Leger, who was convicted by a jury of his peers of three counts of conspiracy to commit murder. In arriving at a sentence the Court has carefully considered the pre-sentence investigation report, the victim's impact statements, character references, and all of the sentencing guidelines of Louisiana Code of Criminal Procedure Article 894.1, specifically the Court considered the fact that the defendant has been convicted of conspiring with Kenneth Vickers, Jr. to murder three women, including the defendant's ex-wife and ex-girlfriend. In

60

participation in these conspiracies, Mr. Leger knowingly created a great risk of death or great bodily harm for all three victims. As a result of the accomplishment of the goal of the conspiracy three young mothers were violently taken from their children and families. Mr. Leger's two children now have no mother. The losses suffered by the families of the victims are immeasurable and permanent. An act so cruel and selfish cannot call for or deserve sympathy or leniency. A modest sentence would greatly deprecate the seriousness of defendant's crime. The Court, therefore, imposes the following sentences, and as everyone is aware the maximum sentence would be thirty years per charge. For the crime of conspiracy to commit second degree murder of Brandy Vickers, Mr. Leger is sentence to serve twelve years at hard labor. For the crime of conspiracy to commit second degree murder of Jennifer Leger, Mr. Leger is sentenced to serve twelve years at hard labor. For the crime of conspiracy to commit second degree murder of Michelle Leger, Mr. Leger is sentence to serve twelve years at hard labor. All sentences shall run consecutively.

Defendant specifically alleges that the trial judge failed to take into consideration several mitigating factors when he fashioned the sentences. In brief, Defendant lists the factors the trial judge should have considered as follows:

1. Defendant has no felonies, only misdemeanors not punishable by more than six months imprisonment;

2. Defendant was a passive participant in the commission of the offenses and played a minor role;

3. Defendant aided in the apprehension of the shooter of the three victims;

4. Defendant testified on behalf of the State in the prosecution of the shooter of the victims;

5. Defendant had been a person of good character and had a good reputation in the community;

6. That he could not have foreseen that his conduct would cause or threaten serious bodily harm or fear.

The record does not support the allegation that Defendant helped to apprehend the shooter. Kenneth Vickers, Jr., confessed the killings to various members of his family immediately after the shootings, and passively waited for the police. Defendant admits in brief that he has a misdemeanor criminal record. This fact was

61

included in the pre-sentence investigation report which was reviewed by the trial court and noted for the record. The trial judge noted that he had reviewed all the letters of support sent to it by the community. We find that Defendant's actions, first discussing the killing of the victims with Kenneth, then supplying a shotgun and shells with the knowledge that Kenneth intended to murder the three women, was an act in furtherance of the crimes, and Defendant cannot rightfully argue as a mitigating circumstance that he could not have foreseen that his conduct would cause or threaten serious bodily harm or fear.

In *Morrison,* 758 So.2d 283, this court held that a trial court does not have to articulate each and every factor listed as a consideration when imposing a sentence as long as the record indicates that adequate consideration of the guidelines was taken. Further, "[t]he articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1." *State v. Hampton*, 38,017, 38,018, 38,019, 38,020, 38,021, 38,022, p.11 (La.App. 2 Cir. 1/28/04), 865 So.2d 284, 292.

This court finds that the trial judge gave an adequate basis for the sentences and sufficiently complied with the requirements of La.Code Crim.P. art. 894.1.

Defendant further asserts the sentences are constitutionally excessive in light of the circumstances of the case, particularly since the trial court ordered the sentences to be served consecutively.

As noted above, La.R.S. 14:26(B) provides for a term of imprisonment of up to thirty years. Louisiana Code of Criminal Procedure Article 883, in pertinent part, provides that "[i]f the defendant is convicted of two or more offenses based on the

same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively."

Defendant argues that because the sentences were ordered to be served consecutively, the sentences constitute a life sentence for a young man who had no prior felony record.

> A sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. *State v. Bonanno*, 384 So.2d 355 (La.1980). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.

*State v. Texada*, 99-1009, p. 22 (La.App. 3 Cir. 2/2/00), 756 So.2d 463, 480-81, *writ denied*, 00-2751 (La. 6/29/01), 794 So.2d 824, *(quoting State v. Lobato*, 603 So.2d 739, 751 (La.1992)).

In *State v. Barclay,* 591 So.2d 1178 (La.App. 1 Cir. 1991), *writ denied,* 595 So.2d 653 (La.1992), the first circuit affirmed Barclay's thirty-year sentence imposed on a conviction for conspiracy to commit aggravated rape on an eighty-year-old woman who died as a result of her injuries. Barclay held the woman as his co-defendant attempted to rape her, but left within ten to fifteen minutes. After he left, the co-defendant continued the assault. Barclay was seventeen at the time of the offense and had only a few minor infractions as a juvenile. The first circuit stated that "[d]espite defendant's age and first offender classification, the district court imposed the maximum sentence, noting that defendant's first venture into adult crime was of major proportions . . . . This crime was heinous, and the penalty imposed for this crime upon this particular defendant certainly does not shock one's sense of justice." *Id.* at 1183.

Similarly in the present case, Defendant conspired to kill three young mothers, two of whom were the mothers of his children, and the third, the mother of Kenneth's children. While Defendant may not have pulled the trigger, his active participation was as heinous as the actions of Kenneth who shot the victims with a shotgun while their children watched. The fact that Defendant was not the shooter does not detract from the shocking nature of the crimes of which he was convicted.

We find a sentence of twelve years for each conviction, to be served consecutively for a total term of imprisonment of thirty-six years, does not shock one's sense of justice. Accordingly, the trial court did not abuse its considerable discretion when it sentenced the Defendant. This assignment lacks merit.

## CONCLUSION

The Defendant's convictions and sentences are affirmed.

**AFFIRMED.**