NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-816

STATE OF LOUISIANA

VERSUS

RONALD L. BRYANT

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 05-209
HONORABLE PAUL JOSEPH DEMAHY, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of Glenn B. Gremillion, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED.**

**Mark Owen Foster**
**Louisiana Appellate Project**
**P.O. Box 2057**
**Natchitoches, LA 71457-2057**
**(318) 572-5693**
**Counsel for Defendant-Appellant:**
**Ronald L. Bryant**

**Hon. J. Phillip Haney**
**District Attorney, 16ᵗʰ JDC**
**Jeffrey J. Trosclair**
**Assistant District Attorney, 16ᵗʰ JDC**
**St. Mary Parish Courthouse, 5th Floor**
**Franklin, LA 70538**
**(337) 828-4100**
**Counsel for Plaintiff-Appellee:**
**State of Louisiana**

**Pickett, Judge.**

<u>FACTS</u>

Kendra Polk, Sherry Gage's sister, testified that she had gone shopping with Ms. Gage during the evening of December 29, 2004. After meeting up with Ms. Gage at their grandmother's house, the sisters, along with their three children, picked up William Tharpe, Ms. Gage's friend from work. Next, the group stopped at Ms. Gage's home so she could change clothes. Ronald Bryant, the defendant, was living with Ms. Gage at that time and was in the house when they arrived. According to Mr. Tharpe, Ms. Gage and the defendant had an argument. When Ms. Gage left the house, the defendant slammed the front door. The group proceeded to shop, and following same, Ms. Gage dropped off Ms. Polk and the children at their grandmother's house. Next, Ms. Gage dropped off Mr. Tharpe at his house where he resided with his parents.

Around 8:00 a.m. the next morning, Ms. Gage's boss at Burger King, Nicole Doucet, called the grandmother's house and informed them that Ms. Gage had not reported to work that morning. Ms. Doucet also contacted Mr. Tharpe at another Burger King to see if he knew of her whereabouts. Ms. Polk contacted her aunt and they proceeded together to Ms. Gage's home. Mr. Tharpe and his sister followed Ms. Polk and her aunt to Ms. Gage's home. On the way to Ms. Gage's house, Mr. Tharpe noticed Ms. Gage's car parked on a side street about a block from her home, which he felt was unusual. According to Mr. Tharpe and Ms. Gage's neighbor, Patrick Stewart, Ms. Gage usually parked her car in front of her house.

When they arrived at Ms. Gage's house, they knocked on the front and side doors and the windows. There was no answer. Ms. Gage did not have a phone so

1

they were unable to call her. Ms. Polk called the landlord to come open the door and made a call to 911. The landlord arrived in less than fifteen minutes with the key. When Mr. Tharpe inserted the key into the door, the defendant opened the door from inside the house. The defendant was not wearing any clothing when he opened the door and stated that he was taking a bath. He also stated that Ms. Gage was not there because she had gone to work. When Mr. Tharpe backed away from the door, the defendant closed the door.

Ms. Polk contacted 911 once more and an officer arrived thereafter. Deputy Jason Boudreaux was apprised of the situation and knocked on the door. When no one answered, the officer went around the house and knocked on the back door. Soon thereafter, the defendant was seen exiting the house through a window, and Deputy Boudreaux attempted to apprehend him. Following a struggle with Deputy Boudreaux, the defendant broke free and took off running.

Next, the detectives arrived and decided to enter the home. Due to the emergent nature of the incident and because the door was locked, the door was kicked in and the detectives began to check the house. They discovered Ms. Gage under a box spring and mattress lying face down on her stomach. Ms. Gage was turned over, revealing a necktie that had been tied around her neck and hands and a wound to her neck. Ms. Gage's autopsy indicated that she died from asphyxia due to compression of the neck from the necktie. The defendant was eventually apprehended at around 6:00 p.m. at the Dollar General Store.

The defendant's testimony at trial contradicted that of the state's witnesses. The defendant stated that Ms. Gage returned home from shopping around 10:00 to 10:30 p.m. and gave him the keys to her car to go get something to eat. When the

2

defendant returned home, a gentleman was in the house with Ms. Gage, sitting with her on the bed. He had never seen the man before and the man had not been present in the courtroom during the trial. The defendant denied becoming angry because of the man's presence in the house. Instead, the defendant confirmed with Ms. Gage that she had a ride to work in the morning and then left the house in Ms. Gage's car. According to the defendant, he drove the car a block and a half from the house, parked the car and went to sleep.

When the defendant woke the following day around 11:00 a.m., he got out of the car and walked to a nearby place that served food. Because the place did not begin serving until 3:00 p.m., the defendant decided to go back later. Instead of returning to the car, the defendant walked to the house and watched a bit of television before entering Ms. Gage's room and discovering her body. The defendant found Ms. Gage lying on the floor on her side halfway under the bed. He lifted the bed and touched her body to see if she was alive and then lowered the bed back down on her body.

Next, the defendant ran to the bathroom and started throwing water on his face and hands when he heard beating on the front door, the back door, the side door and windows. According to the defendant, he was so scared that he would not answer the door. He eventually opened the door, naked, because his clothes had gotten wet in the process of throwing water on his face and hands. A "short guy" was at the door saying something and when someone pulled him back away from the door, the defendant closed the door. He got dressed and attempted to exit the back door but it was locked from the outside. The defendant opted to climb through a window and Deputy Boudreaux attempted to apprehend him. The two men tussled and the

3

defendant managed to get away. The defendant was eventually arrested at the Dollar Store at about 6:00 p.m. He denied killing Ms. Gage.

On February 1, 2005, the defendant was indicted by a grand jury with second degree murder, a violation of La.R.S. 14:30.1. The defendant entered a plea of not guilty on March 7, 2005. A trial on the merits began on December 5, 2005. On December 7, 2005, the jury found the defendant guilty as charged.

The defendant was sentenced on December 12, 2005, to serve life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant is now before this court on appeal, alleging two assignments of error:

1.  The evidence was insufficient to support the conviction.

2.  The trial court abused its great discretion in allowing the state to conduct an "experiment" in front of the jury of demonstrating strangulation with a necktie.

## ASSIGNMENT OF ERROR NO. 1:

In his first assignment of error, the defendant argues that the evidence was insufficient to support the conviction. More specifically, the defendant maintains that he was convicted on entirely circumstantial evidence, and thus the evidence must exclude every reasonable hypothesis of innocence. *See* La.R.S. 15:438. The defendant contends that the circumstantial evidence in this case did not exclude all other reasonable possibilities that someone else could have killed Ms. Gage.

The analysis for a claim of insufficient evidence is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d

4

126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The elements of the crime at issue are set forth in La.R.S. 14:30.1, which states, in pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; . . .

The use of circumstantial evidence is addressed in La.R.S. 15:438 which states, "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

The defendant asserts that the first problem with the state's case is a serious gap in the time line of events. More specifically, the defendant complains that the state's witnesses were not asked what time they arrived at Ms. Gage's home and when the particular events occurred. Further, the defendant avers that none of the state's witnesses place him at Ms. Gage's home prior to 11:00 a.m.; thus, the state's evidence has not excluded or rebutted the fact that defendant arrived at the home at 11:00 a.m., one to two hours after Ms. Gage was killed.

A review of the record reflects the following time line of events which was described by two witnesses. Ms. Polk, Ms. Gage's sister, testified that she first

5

arrived at Ms. Gage's home around 9:00 a.m. and that she was followed by Mr. Tharpe. Mr. Tharpe testified that they arrived around 10:30 to 11:00 a.m. Thus, as stated by the defendant, there does exist a one and one-half to two hour discrepancy with regard to the time they first arrived at the home. These two witnesses were the only two witnesses called by the state to testify about the events when they first arrived at the home. The defendant's allegation that the state purposely created confusion by not asking the witnesses what time they arrived is without merit.

After they arrived at the home and knocked on the door to no avail, Ms. Polk called 911 and called the landlord for a key. According to Ms. Polk, the landlord arrived about fifteen minutes later with the key. Law enforcement had not yet arrived on the scene. After Mr. Tharpe attempted to unlock the door and the defendant subsequently opened and closed the door, Ms. Polk called 911 once more. Deputy Boudreaux, the first officer to arrive on the scene, presented at approximately 11:26 a.m. Accordingly, Mr. Tharpe's testimony that he arrived around 10:30 a.m. is consistent with the amount of time that elapsed before Deputy Boudreaux's arrival on the scene at 11:26 a.m. As such, the testimony of these two witnesses places the defendant at Ms. Gage's home prior to 11:00 a.m., and again, the defendant's allegation that none of the state's witnesses place him at the home prior to 11:00 a.m. is without merit.

Next, the defendant maintains that Deputy Boudreaux was present when the landlord arrived to unlock the door. Because Deputy Boudreaux testified that he arrived on the scene at 11:26 a.m., the defendant asserts that Ms. Gage's family and friends arrived well after the defendant allegedly returned home at 11:00 a.m. Deputy Boudreaux's testimony, however, indicates that he arrived just before the defendant

6

climbed out of the window to escape, not prior to the arrival of the landlord with the key.

The defendant also complains that the state did not account for Ms. Gage's whereabouts from 5:30 a.m., the time she was late for work, to 9:30 to 10:30 a.m., the estimated time of her death. The defendant stresses that there was no medical evidence that there had been a several hour struggle between the defendant and Ms. Gage. Although the defendant is correct in that this evidence was not adduced at trial, the evidence of same has little relevance in proving the elements of the crime involved.

Lastly, the defendant maintains that the state did nothing to exclude the reasonable possibility that one of Ms. Gage's boyfriends or her husband committed the crime. The record reflects that Ms. Gage was having a sexual relationship with Mr. Tharpe the month prior to her death. There is no evidence, however, that places him at the scene of the crime in proximity to the time of her death. Mr. Tharpe testified that he arrived at work at 5:00 a.m. on the day Ms. Gage died. Further, Ms. Doucet testified that Mr. Tharpe was at work when she called him to inquire about Ms. Gage's whereabouts. Also, Mr. Tharpe confirmed that he had received Ms. Doucet's call at work that morning at about 9:30 a.m. The record is void of any evidence of hostility between Mr. Tharpe and Ms. Gage.

Ms. Gage was also well acquainted with Patrick Coleman, a resident of Baton Rouge, Louisiana, who testified that he had broken up with Ms. Gage on Labor Day of 2004, approximately four months before her death, because she had cheated on him. Mr. Coleman added that Ms. Gage had attempted to contact him several times before December 28, 2004, but he would not answer her calls. His last conversation

7

with Ms. Gage was on December 28, 2004, and was initiated by Ms. Gage. Mr. Coleman testified that during this conversation, Ms. Gage suggested that they rekindle their relationship. Mr. Coleman declined to do so. There is no evidence that Mr. Coleman was in the area of the crime or that Mr. Coleman expressed any violence or ill will toward Ms. Gage.

Ms. Gage's husband, Glen Gage, testified that they had been married six years, but had separated in Spring 2004 and were living apart at the time of her death. Mr. Gage was living with his sister in Jeanerette, Louisiana, while Ms. Gage was residing in New Iberia, Louisiana. According to Mr. Gage, he and Ms. Gage were "getting along pretty good" and talked of reconciliation. Mr. Gage was aware that Ms. Gage was living with the defendant at the time of her death and had met him, briefly, on one occasion. He also testified that he was aware that Ms. Gage was seeing other men. Mr. Gage denied being angry about the other men, describing his feelings as being "hurt." Lastly, Mr. Gage denied killing Ms. Gage or making any threats against her life. Again, there is no evidence in the record which indicates that Mr. Gage was in the area at the time of Ms. Gage's death.

There is no evidence that any other man was in the house the night before or the morning of Ms. Gage's death other than the defendant's testimony that Ms. Gage was with an unknown man the night of her death. In *State v. Leger*, 04-1467, pp. 27-28 (La.App. 3 Cir. 6/1/05), 907 So.2d 739, 758, *writ denied*, 05-2263 (La. 4/17/06), 926 So.2d 509, *cert. denied*, ___ U.S. ___, 127 S.Ct. 245 (2006), this court observed as follows:

> The Defense sets forth various hypotheses of innocence that the jury failed to consider. Had it done so, the Defense contends an acquittal would have been mandated. As discussed above, when a conviction rests on circumstantial evidence, every reasonable hypothesis

8

of innocence must be excluded. "However, La.R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt standard; it is merely an evidentiary guide for the jury when considering circumstantial evidence." *State v. Manning*, 03-1982, p. 46 (La.10/19/04), 885 So.2d 1044, 1088 (*citing State v. Porretto*, 468 So.2d 1142, 1146, (La.1985)).

Considering the absence of evidence which suggests the possibility that another perpetrator committed the crime, the state adequately excluded the possibility a boyfriend or Ms. Gage's husband committed the crime.

Lastly, the defendant asserts that scientific evidence does not support the hypothesis that the defendant killed Ms. Gage. More specifically, the defendant complains that the autopsy did not prove that he was the killer and that there was none of his DNA on the murder weapon or other evidence which linked him to the murder. In this assignment of error, the defendant complains that he was convicted on entirely circumstantial evidence that does not exclude every reasonable hypothesis of innocence. The defendant, however, is attacking the lack of physical DNA evidence to support his conviction, not the use of circumstantial evidence. There is no dispute that the state lacks physical DNA evidence in this matter. The state presented sufficient circumstantial evidence for the jury to conclude that the defendant committed the crime.

**ASSIGNMENT OF ERROR NO. 2:**

In his second assignment of error, the defendant argues that the trial court abused its discretion in allowing the state to conduct an "experiment" in front of the jury, demonstrating Ms. Gage's strangulation with a necktie. Dr. Cameron Snider, a forensic pathologist and expert in the field of forensic autopsies, wrapped a necktie around a female volunteer, an employee of the district attorney's office, to demonstrate how Ms. Gage was strangled to death. Relying on *State v. Rault*, 445

9

So.2d 1203 (La.1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 225 (1984), the defendant maintains that there is no similarity between the courtroom conditions and the conditions at Ms. Gage's home, and thus, the trial court erred in allowing same.

In *Rault*, defense counsel moved to introduce into evidence a four-hour tape recording of a hypnotic session by the defendant and a hypnotist to illustrate to the jury the hypnotic technique. Defense counsel argued that the tape was not offered to establish the truth of the contents, but was intended to show that the defendant had been in a hypnotic trance and to negate suggestibility in the conduct of the session. The trial court ruled that the tape was inadmissible. In rendering its decision, the supreme court stated:

> A trial court has great discretion in permitting or refusing in-court experiments and demonstrations. Criteria for withholding permission include "considerations arising from the possible disruption of orderly and expeditious proceedings or from the lack of similarity between courtroom conditions and the actual conditions sought to be re-tested." *State v. Mays*, 315 So.2d 766, 768 (La., 1975). See also *State v. Hampton*, 326 So.2d 364 (La., 1976).

*Id*. at 1208. The court noted that what the defendant had proposed was not a simple demonstration of the physical characteristics as was permitted in *State v. Square*, 433 So.2d 104 (La.1983), the display of teeth, and *State v. Crochet*, 354 So.2d 1288 (La.1977), the display of a tattoo. Further, the court stated that it was not clear that the hypnotist could have recreated the same trance state that the defendant had previously obtained. Considering same, the supreme court concluded that the trial court did not abuse its discretion in disallowing the tape recording and hypnosis demonstration, which it found were both cumulative and of questionable validity.

Next, the defendant argues that the problem with ill-prepared demonstrations outside the ordinary examination and cross-examination is that the demonstration can

10

violate a defendant's constitutional right to confront a witness, citing *State v. Langley*, 95-1489 (La. 4/14/98), 711 So.2d 651. The defendant complains that he had no one to cross-examine following the experiment who knew anything about the circumstances of where and how the death occurred.

Lastly, the defendant asserts that pursuant to La.Code Evid. art. 705(B), the demonstration should not have been allowed as a basis of the facts upon which Dr. Snider based his opinion. Article 705(B) reads, "In a criminal case, every expert witness must state the facts upon which his opinion is based, provided, however, that with respect to evidence which would otherwise be inadmissible such basis shall only be elicited on cross-examination." The defendant argues that Dr. Snider never needed nor conducted such an experiment to determine Ms. Gage's cause of death. In support of his argument, the defendant refers once more to *Langley*, 711 So.2d 651. In *Langley*, the defendant argued that the trial court erred by not allowing him to present excerpts of a videotape of his interview with a specialist in forensic psychiatry and neurology. The defendant proposed that the jurors listen to a twenty minute excerpt from a five-hour interview to determine for themselves the credibility of the defendant's statements. In his attempt to admit the tape into evidence, the defendant made several different arguments, including the argument that the tape was admissible as evidence upon which his treating psychiatrist relied in forming her opinion. Although his psychiatrist had received a copy of the tape, she testified that it did not assist her in forming her opinion. Accordingly, the court concluded that the tape was not admissible under La.Code Evid. art. 705(B).

In the instant case, the minutes reflect that the state, outside the presence of the jury, advised the trial court of its intent to use an intact necktie demonstration during

11

the testimony of Dr. Snider. The defendant objected to the use of the necktie and to the state's use of a photo of the demonstration instead of admitting the necktie. Following arguments the trial court overruled the defendant's objection.

Dr. Snider performed an autopsy on Ms. Gage on December 30, 2004. Based on the evidence at the scene and the evidence on Ms. Gage's body, a necktie wrapped around Ms. Gage's neck in a ligature type fashion, Dr. Snider determined that Ms. Gage died from asphyxia. Dr. Snider testified that when he received Ms. Gage's body, a necktie was wrapped around Ms. Gage's wrists, but was no longer around her neck. He also noted evidence that something had been wrapped around her neck causing ligature type injuries. The necktie had been cut so that it was resting only around the writs at the time of the examination. Dr. Snider explained how the various portions of the tie were located on Ms. Gage's body and photographs were submitted into evidence. To demonstrate the method the necktie was used to kill Ms. Gage, Dr. Snider placed a necktie on a female volunteer, Kathleen Theriot. Lastly, a photograph of Ms. Theriot was taken with the necktie in place in lieu of having her remain in that position for the remainder of the trial. The demonstration necktie was offered into evidence.

The facts in *Rault* provide little to no support for the defendant's argument in the instant case. The defendant's proposal in *Rault* was not a simple demonstration of physical characteristics. Dr. Snider's demonstration in the case sub judice was nothing more than a demonstration of how the necktie asphyxiated Ms. Gage. The state was not attempting to recreate the murder scene.

With regard to the defendant's assertion that ill-prepared demonstrations outside the ordinary examination and cross-examination violate his constitutional right to

12

confront a witness, we note that the defendant's reliance on *Langley* in support of same is misguided – this issue is not discussed in *Langley*. Further, the defendant's complaint that he had no one to cross-examine following the experiment is unfounded. Dr. Snider, a qualified expert in the field of forensic pathology as well as the physician who performed Ms. Gage's autopsy, could clearly address any questions propounded by the defendant on cross-examination regarding the mechanics of the demonstration.

The defendant's reliance on La.Code Evid. art. 705(B) and *Langley* for the proposition that Dr. Snider never needed nor conducted such an experiment to determine Ms. Gage's cause of death is also misguided. The evidence in *Langley* did not involve a demonstration or experiment as is seen in the instant case. Also, the defendant in *Langley* sought to admit the evidence at issue, whereas the defendant in the case sub judice sought to exclude the state's demonstration. The issue in *Langley* and the application of Article 705(B) simply do not apply to the issue in this matter.

As stated above in *Rault*, a trial court has great discretion in permitting or refusing such demonstrations. Considering the record in this matter, the defendant has not shown that a lack of similarity between courtroom conditions and the actual conditions sought to be re-tested had any affect on the demonstration. The defendant made no specific complaints about the demonstration itself, i.e., that a different type of necktie was used, other than making the blanket statement that there was a lack of similarity between the courtroom conditions and the actual crime scene. Therefore, we find that the trial court did not abuse its wide discretion in allowing the demonstration of Ms. Gage's asphyxiation by Dr. Snider and the volunteer.

13

## CONCLUSION

The defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Rule 2-16.3, Uniform Rules, Courts of Appeal.